*** FOR PUBLICATION ***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____
                                          :
RYAN HART, individually and on            :      Civil Action No. 09-5990
behalf of all others similarly situated,  :
                                          :
            Plaintiff,                    :
                                          :
v.                                        :      **OPINION**
                                          :
ELECTRONIC ARTS, INC., and                :
JOHN DOES, 1-50,                          :
                                          :
            Defendants.                   :
_____:

**WOLFSON, United States District Judge:**

In this putative class action lawsuit, Plaintiff Ryan Hart filed suit on behalf of himself and all others similarly situated against Defendant Electronic Arts, Inc. ("Defendant"), alleging, *inter alia*, that Defendant appropriated Plaintiff's likeness and used his likeness for commercial purposes in connection with Defendant's *NCAA Football* video games. The suit was initially filed in the Superior Court of New Jersey, Law Division, Somerset County, and then removed by Defendant to this Court. Defendant now moves to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that each count of the Amended Complaint—invasion of privacy-right of publicity (appropriation of commercial likeness),[1] New Jersey Consumer Fraud Act ("NJCFA"), unjust enrichment, and conspiracy—fails to state a claim. For the following reasons, Defendant's motion is granted. Plaintiff's right of publicity claim is dismissed

---

[1]      As New Jersey and federal courts applying New Jersey law interchangeably refer to these claims as appropriation or misappropriation of commercial likeness, and "right of publicity," this Court will do the same.

without prejudice and Plaintiff is granted leave to amend that claim. His remaining claims are dismissed with prejudice.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff filed the original complaint in this action in the Superior Court of New Jersey, Law Division, Somerset County, on June 15, 2009. In that complaint, Plaintiff alleged that, without his consent, Defendant advertised and sold products bearing his identity and likeness from the years in which he played as a quarterback on the Rutgers University football team.[2] Compl. at ¶¶ 1, 6. Shortly thereafter, on July 28, 2009, Defendant moved for a more definite statement. In that motion, Defendant argued that the Complaint failed to identify which games depicted Plaintiff's likeness and "what attributes . . . of plaintiff[ ] constitute[s his] likeness ...." Notice of Removal, Exh. B, Def. Mot. More Definite Statement at 2. That motion was heard in state court on September 11, 2009. At the hearing, the parties placed a settlement, with respect to that motion only, on the record. Id., Rosen Ltr. dated September 17, 2009 at 1. Per their agreement, Plaintiff was to file an amended complaint that included "the names of the video game(s) and the version/year of those game(s) upon which plaintiff[ is] seeking relief." Id. Thereafter, Defendant withdrew its motion. On October 24, 2009, Plaintiff filed an Amended Complaint. Defendant then removed the suit to this Court, on November 24, 2009, and this motion to dismiss followed.

In his Amended Complaint, Plaintiff asserts right of publicity, NJCFA, unjust enrichment, and conspiracy claims based on Defendant's use of Plaintiff's image in its *NCAA Football* video game series for the years of 2004, 2005 and 2009. Am. Compl. at ¶ 22. In connection with the 2009 game, he alleges that a photograph of him appears in a photo montage of actual college

---

[2]      Troy Taylor was a co-plaintiff in the original Complaint in this action. He is no longer party to this suit, however, and Plaintiff Ryan Hart proceeds as the sole plaintiff.

players.  He asserts two invasion of privacy claims, one titled "Appropriation of Likeness" and one titled "Appropriation of Likeness for Commercial Purposes."  See id. at pp. 5-6.  In connection with these claims, he asserts that Defendant "incorporate[ed] Plaintiff's identify [sic] and likeness into its video games."  Id. at  ¶ 20; see also id. at ¶ 25 ("Defendant . . . invaded Plaintiff's right to privacy by appropriating Plaintiff's likeness by including him in its video games.").  Plaintiff clarifies, in his opposition papers, that these two claims should be construed as one claim instead. Pl. Opp. at 13.

In connection with his NJCFA claim, Plaintiff alleges that Defendant violated the NJCFA's prohibition against unlawful, unfair, or fraudulent acts by: (a) failing to disclose to its customers that Plaintiff has not consented to the use of his image, (b) appropriating Plaintiff's likeness in order to enhance its sales; and (c) engaging in deceptive practices by "misleading the public that Plaintiff endorsed the use of his likeness."  Id. at ¶ 34.  His unjust enrichment claim alleges that Defendant has been unjustly enriched by Defendant's use of his likeness, id. at ¶ 39-42, and his conspiracy claim alleges that Defendant and JOHN DOES 1-50 conspired to utilize Plaintiff's image in "disregard of the rights of Plaintiff."  Id. at ¶ 45.

The Amended Complaint does not address what attributes of Plaintiff appear in the NCAA Football games; however, in opposition to this motion, Plaintiff submitted a Declaration in which he avers additional facts.  Specifically, Plaintiff's Declaration avers that NCAA Football depicts a "virtual" player in screen shots that replicate photos taken of Plaintiff while playing as a Rutgers University quarterback from 2002 through 2005.  Pl. Decl. at ¶ 12, Exh. A-E.  Plaintiff, further, points to the NCAA Football 2006 game, which "lists the Rutgers University 'virtual' QB as hailing from Florida," and avers that he was "the only Rutgers "QB during this time from Florida."  Id. at 14.  Regarding physical attributes, Plaintiff asserts that:

3

     a.   I was listed as standing six (6) feet and two (2) inches tall, the same height as the "virtual" Rutgers QB in the *NCAA Football* game versions in question;

     b.   I weighed one hundred ninety-seven pounds (197 lbs.), the same weight as the "virtual" Rutgers QB in the *NCAA Football* game versions in question;

     c.   My Jersey number was 13, the same as the "virtual" Rutgers QB in the *NCAA Football* game versions in question;

     d.   I wore a left wrist band, the same as the "virtual" Rutgers QB in the *NCAA Football* game versions in question; and

     e.   I wore a helmet visor, the same as the "virtual" Rutgers QB in the *NCAA Football* game versions in question.

Id. at ¶ 15.  In addition, Plaintiff avers, the *NCAA Football 2006* game used the same "speed and agility rating," "passing accuracy," and "arm strength in the video [g]ame compared to actual footage."  Id. at ¶ 17.  Similarly, the game "shows my contribution to the team and importance to total team success as identical to the actual season," he asserts.  Id. at ¶ 18.  Finally, Plaintiff avers in his declaration that actual video footage of him was "used in the promotion for Defendant EA's NCAA game wherein I was throwing a pass [in a] Rutgers' bowl game against Arizona State."  Id. at ¶ 19.

     In his opposition brief, Plaintiff asserts additional facts not found in his declaration. Specifically, he asserts that, while playing at Rutgers, he agreed to be bound by the NCAA rules, regulations and bylaws, including NCAA "Bylaw 12.5 [which] prohibits the commercial licensing of the 'name, picture or likeness' of a student athlete while he/she attends an NCAA-member institution."  Pl. Opp. at 1-2.  Further, he states, that "[d]uring [his] college career in 2002, 2003, 2004 and 2005, [he] had forgone commercial opportunities in order to maintain his eligibility as an NCAA student athlete at Rutgers University."  Id. at 2.  In terms of the role of his likeness in the

game, Plaintiff asserts that the game "allows the public to simulate the college football playing experience by stepping into the shoes of Rutgers' QB Ryan Hart, and other college football players, where fans can mimic Plaintiff's style and movements and play against Plaintiff's actual opponents." Id. at 3.

Defendants filed the instant motion on January 12, 2010, seeking to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). As noted, Plaintiff has opposed the motion and filed a Declaration in support thereof. Having reviewed all the parties' motion papers, the motion is now ripe for decision.

## II.    STANDARD OF REVIEW

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 561 (quoting Conley, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 555. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence of 'the necessary element'." <u>Phillips</u>, 515 F.3d at 234 (quoting <u>Twombly</u>, 550 U.S. at 556).

In affirming that <u>Twombly</u> standards apply to all motions to dismiss, the Supreme Court recently explained the principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009); <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Iqbal</u>, 129 S.Ct. at 1950. Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." <u>Fowler</u>, 578 F.3d at 211.

On a Rule 12(b)(6) motion to dismiss, a court must limit its review to the pleadings. A court may not consider matters extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint," and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted) (emphasis omitted).

Based on this doctrine, Defendants argue that the Court may consider the 2004, 2005, and 2009 <i>NCAA Football</i> video games it submitted to the Court in connection with its motion. The Court agrees that the video games may be considered in the context of this motion. However, the

6

Court may not consider the other declarations and exhibits that Defendant attached to its motion, including the license agreement between it and the National Collegiate Athletics Association ("NCAA"), see Strauser Decl., Exh. F, because those documents/materials are not integral to or referenced in the plaintiff's pleadings.

Furthermore, a party may not amend his pleadings by making factual assertions in a brief. Penn ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1998); Cardiology Consultants of North Morris v. UFCW Local, Civil Action No. 06-5557, 2007 WL 4570160, *3 n.5 (D.N.J. Dec. 21, 2007) (citations omitted). Nor may he amend his complaint through a declaration or certification. Del Sontro v. Cendant Corp., Inc., 223 F.Supp.2d 563, 581 (D.N.J. 2002). See also McArdle v. Tronetti, 961 F.2d 1083, 1089 (3d Cir. 1992) ("[D]efects in [a] complaint clearly [can] not be remedied by [an] affidavit."). Accordingly, the Court may not consider the allegations made in Plaintiff's opposition papers or declaration.

That said, "if a complaint is vulnerable to [Federal Rule of Civil Procedure] 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Travelers Indem. Co. v. Dammann & Co., Inc., 594 F.3d 238, 256 n. 14 (3d Cir. 2010) (quoting Phillips, 515 F.3d at 236) (citation omitted). This rule applies "even if the plaintiff does not seek leave to amend." Id. (citing Phillips, 515 F.3d at 245 (citation omitted)). Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Id. (quoting In re Burlington Coat Factory, 114 F.3d at 1434). Thus, the Court may consider the allegations made in Plaintiff's opposition papers and declaration to determine whether a second amendment of his complaint would be futile.

III.    DISCUSSION

Defendant makes specific challenges to each of Plaintiff's causes of action.[3]  As to Plaintiff's right of publicity claim, Defendant argues that Plaintiff has failed to point to specific attributes that belong to Plaintiff, which are misappropriated in the video game.  In addition, and in the alternative, Defendant argues that the video game's use of Plaintiff's height, weight, and home state do not impinge upon Plaintiff's right to publicity.

Furthermore, Defendant argues that the *NCAA Football* games are expressive works entitled to full First Amendment protection.  In response, Plaintiff urges this Court to adopt the transformative test employed by the court in Keller v. Electronic Arts, Inc., No. C 09-1967, 2010 WL 530108 (N.D.Cal. Feb. 6, 2010), a factually similar case brought by a former college football player against Defendant.  That case ruled in favor of the plaintiff, holding that the Defendant was not entitled to First Amendment protection for its use of the plaintiff's likeness in its *NCAA Football* video games.

With regard to Plaintiff's NJCFA claim, Defendant argues that Plaintiff has failed to allege, *inter alia*, that he does not have standing under the NJCFA because he is not a consumer. Defendant argues, with respect to Plaintiff's unjust enrichment claims, that they must be dismissed because there is no direct relationship between it and Plaintiff.  And, lastly, Defendant argues that Plaintiff's civil conspiracy claim must be dismissed for failure to allege an agreement.

A.    Right of Publicity

The right to publicity is one of four invasion of privacy torts recognized in the Restatement (Second) of Torts, § 652.  Castro v. NYT Television, 370 N.J.Super. 282, 296 (App. Div. 2004).[4]

---

[3]      The parties agree that New Jersey law governs their dispute.

[4]      "The others are invasion of privacy by an unreasonable intrusion upon the seclusion of another, § 652B, giving unreasonable publicity to another's private life, § 652D, and publicity that unreasonably places a person in a false light in the public eye, § 652E."  Id.

Succinctly put, "[New Jersey's] right of publicity signifies the right of an individual, especially a public figure or celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for commercial benefit." McFarland v. Miller, 14 F.3d 912, 918 (3d Cir. 1994) (citations omitted) quoted in Prima v. Darden Rest., 78 F.Supp.2d 337, 348 (D.N.J. 2000); see also Jarvis v. A & M Records, 827 F.Supp. 282, 297 (D.N.J. 1993) ("The right of publicity generally applies to situations where the plaintiff's name, reputation or accomplishments are highly publicized and the defendant used that fact to his or her advantage."). Underlying this right is the theory that "a celebrity has the right to capitalize on his persona, and the unauthorized use of that persona for commercial gain violates fundamental notions of fairness and deprives the celebrity of some economic value in his persona." Prima, 78 F.Supp.2d at 349 (citing McFarland, 14 F.3d at 919); Castro, 370 N.J.Super. at 297 ("The foundation for this tort is recognition that a person has an interest in their name or likeness 'in the nature of a property right.") (quoting Restatement (Second) of Torts, § 652C comment a.). Because celebrity status often translates to economic wealth, the unauthorized use of one's persona "harms the person both by diluting the value of the name and depriving that individual of compensation." Prima, 78 F.Supp.2d at 849 (citing McFarland, 14 F.3d at 919).

As an initial matter, the Court addresses Defendant's preemption argument relating to Plaintiff's allegations regarding the use of his photograph in a photo montage of actual college players in *NCAA Football 2009.* Defendant concedes that this image was used without Plaintiff's consent, but argues that Plaintiff's claim is preempted by the Copyright Act because Defendant licensed that photograph from Collegiate Images, LLC, citing Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1139 (9th Cir. 2006), in support of its argument. Because Defendant's argument relies upon the license agreement, and that agreement may not be properly considered

on a motion to dismiss, the Court denies without prejudice Defendant's preemption argument at this juncture.

With respect to Plaintiff's remaining right of publicity allegations, Plaintiff's Amended Complaint fails to put forth sufficient facts detailing the attributes Plaintiffs believes are appropriated in the *NCAA Football* game. As explained above, Plaintiff included the attributes in a declaration attached to this opposition papers but that declaration may not be properly considered on a motion to dismiss. In addition, Plaintiff makes further factual assertions in his opposition papers, such as stating that his weight was listed in the game as "one hundred ninety-seven pounds (197 lbs.)," which corresponds to his actual weight at the time. See Pl. Opp. at 4. However, Plaintiff may not amend his pleadings through his briefing. Looking solely to the Amended Complaint, Plaintiff's failure to plead any allegations regarding the attributes found in the games does not meet the <u>Twombly</u> pleading standard. "[A] complaint must do more than allege the plaintiff's entitlement to relief. [It] has to 'show' such an entitlement with its facts." <u>Fowler</u>, 578 F.3d at 211. Here, the Court cannot determine whether Plaintiff has a claim that the *NCAA Football* games appropriate Plaintiff's likeness when there are no allegations in the Amended Complaint as to what aspects of his likeness have been appropriated.

Apparently recognizing the need for additional detail, Plaintiff states that he is "willing to file an amended complaint to set forth the statements" made in his brief and declaration. <u>Id.</u> at 1, n.1. Although Plaintiff already had one opportunity to amend at the state court level, the Court will grant Plaintiff's request because the facts alleged in Plaintiff's Declaration and in his opposition appear to state a right of publicity claim under New Jersey law. Should Plaintiff decide to file a Second Amended Complaint in order to include the proposed facts and any additional ones he

chooses to assert, the Court will then consider any subsequent motion by Defendant based on a First Amendment defense.

Plaintiff's proposed allegations, found in his declaration and opposition, are of the sort recognized by New Jersey courts as stating a prima facie right of publicity claim. Courts have explained the prima facie case for infringement of the right of publicity as a two-fold requirement, including allegations of validity and infringement.[5]  See id. (citing McCarthy, The Rights of Publicity and Privacy § 3.1[B]).  Validity relates to whether the plaintiff "owns an enforceable right in the identity or persona," the likeness of which he alleges was misappropriated.  Id. Infringement relates to whether the defendant "without permission, ... used some aspect of identity or persona in such a way that [plaintiff] is identifiable from defendant[s'] use," and that the "defendant['s] use is likely to cause damage to the commercial value of that persona."  Id.

Here, in terms of validity, Plaintiff proposes to assert that he played for Rutgers as a quarterback during the 2002 – 2005 college seasons.  This assertion could sufficiently allege that he has a persona as a Rutgers quarterback.  As to likeness, Plaintiff proposes to aver that the video games depict a "virtual" player in screen shots that replicate photos taken of Plaintiff while playing at Rutgers.  Plaintiff further proposes to assert that the virtual player hails from the same home town, has the same height and weight as he did while a quarterback, wears the same jersey number,

---

[5]      Another formulation of the prima facie case is: "1) the defendant appropriated the plaintiff's likeness, 2) without the plaintiff's consent, 3) for the defendant's use or benefit, and 4) damage."  Jeffries v. Whitney E. Houston Academy P.T., Docket No. L-1389-07, 2009 WL 2136174, *3 (App. Div. Jul. 20, 2009) (citing Faber v. Condecor, Inc., 195 N.J.Super. 81, 86- 90, 477 A.2d 1289 (App.Div.), certif. denied, 99 N.J. 178, 491 A.2d 684 (1984)).  While this formulation contains four elements, the test described in Prima collapses the same elements into only two parts.

wrist band, and helmet visor. In addition, he asserts that the 2006 game used the same speed and agility rating, passing accuracy, and arm strength, mirroring statistics from Plaintiff's actual game footage. These sorts of allegations could provide enough factual matter, if taken as true as they must be on a motion to dismiss, to suggest that the virtual player in the video games depicts Plaintiff's likeness. Consistent with <u>Twombly</u>'s pleading standard, these facts could "raise a reasonable expectation that discovery will reveal evidence of th[is] element" of Plaintiff's right of publicity claim. 550 U.S. at 556.

Regarding the allegations of infringement, Plaintiff's Declaration and statements in his opposition brief allege that, without Plaintiff's permission, Defendant used Plaintiff's likeness in such a way that Plaintiff is identifiable, and that Defendant's use caused damage to the commercial value of Plaintiff's persona. As noted, he alleges that the virtual player has the same physical characteristics, uniform, and game-related statistics as he did while playing at Rutgers, such as Plaintiff's speed and agility rating. These assertions are similar to those in a Ninth Circuit case referenced by a New Jersey treatise. That case, <u>Motschenbacher v. R. J. Reynolds Tobacco Co.</u>, 498 F.2d 821 (9th Cir. 1974) <u>cited in</u> Brent A. Olson, et al., <u>The Right of Publicity in New Jersey</u>, 49 N.J. Prac., Business Law Deskbook § 16:4 (2009-2010 ed.), involved allegations that the Defendant R.J. Reynolds Tobacco Co., owner of the "Winston" name, televised a commercial

> utilizing a color photograph of a professional racing driver's car *in which the driver's facial features were not visible.* Furthermore, in producing the commercial, defendants slightly altered the photograph by changing the numbers on plaintiff's car from "11" to "71," attaching a wing-like spoiler to plaintiff's car, and by adding the word "Winston" to that spoiler. All other familiar characteristics of the car were retained.

<u>Id.</u> at 826 (emphasis added). Ruling in favor of the plaintiff in that case, the Ninth Circuit reasoned that the "distinctive decorations appearing on the car ... were not only peculiar to the

plaintiff's car, but they caused some persons to think the car in question was plaintiff's and to infer that the person driving the car was the plaintiff." Id. at 827.   Similarly, here, the proposed allegations aver that virtual player's physical attributes and statistics are peculiar to Plaintiff and invoke his likeness, even if his exact facial features are not replicated.   Finally, in terms of economic damage, Plaintiff's proposed allegations aver that Defendant's video game sales, for all of its sports-related games, including *NCAA Football*, generate over 4 billion dollars in revenue for Defendant.   The implication of Plaintiff's allegations is that he would now be entitled to sell his own likeness and recover a portion of those monies for himself.

Altogether, Plaintiff's proposed allegations suggest that he may be able to state a right to publicity claim.   Accord Palmer v. Schonhorn Enterprises, Inc., 96 N.J.Super. 72 (Ch. Div. 1967) (ruling in favor of professional golf athletes whose name and playing profiles were included in board game); Presley's Estate v. Russen, 513 F.Supp. 1339 (D.N.J. 1981) (granting preliminary injunction enjoining Elvis impersonator from using Elvis' likeness in products or merchandise connected with the impersonator's stage show).   This includes Plaintiff's allegations regarding the use of his video footage in promotional materials related to a version of the video game.   Accord Tellado v. Time–Life Books, Inc., 643 F. Supp. 904, 909–910 (D.N.J. 1986) (holding that use of photograph of former Vietnam veteran in letter advertising non-fiction Vietnam book violated veteran's right to publicity).

Defendant's key challenge to Plaintiff's proposed allegations is that they fail to demonstrate that Defendant's use of Plaintiff's likeness was for a commercial purpose.   Defendant is correct that, under New Jersey law,

> defendant[s] would be liable for the tort of misappropriation of likeness only if defendant's use of plaintiff's likeness was for a predominantly commercial purpose, *i.e.*, if defendant was seeking to

13

> capitalize on defendant's likeness for purposes other than the
> dissemination of news or information.

Tellado, 643 F. Supp. at 909–10.  Thus, to determine if granting leave to amend would be futile,

the Court considers Defendant's argument.

In support of its argument, Defendant relies upon Castro v. NYT Television, supra.

Castro involved an appropriation of likeness claim asserted by plaintiff emergency-room patients

who had been videotaped after executing a consent form.  The plaintiffs claimed that the

videotapers misrepresented that they were part of the hospital when, in fact, they were media

employees seeking footage for a reality television show.  Because the plaintiffs did nothing more

than assert that "[d]efendants appropriated plaintiffs' likenesses, images and/or names for

commercial profit and advantage," the Castro Court dismissed their claim for failure to allege that

the videotape footage had been used for trade purposes.  370 N.J.Super. at 289.  In reaching its

conclusion, the Castro Court reasoned that "it is irrelevant whether a videotape is broadcast in

connection with a television story about important public events or a subject that provides only

entertainment and amusement ...."  Id.

Defendant focuses its argument on Castro's broad language; however, courts interpreting

Castro have limited its holding to media defendants.  For example, the court in Liebholz v. Harriri,

Civil Action No. 05-5148, 2006 WL 2023186 (D.N.J. Jul. 12, 2006), held that a biotechnology

corporate defendant who fraudulently displayed on its website that a scientist was affiliated with the

company could not rely on Castro to shield it from liability.  That court reasoned:

> Leibholz cannot rely on cases like Castro . . . because those were
> cases in which the mere use of a person's likeness by a media
> defendant, without use of the likeness to encourage more viewership
> or sell more magazines, was held to be incidental and therefore not
> actionable.  Not every use of one's image or likeness by a magazine
> is considered a "commercial use," since otherwise almost any

14

> publication of a name or likeness would be misappropriation.  Use
> of names and likenesses by non-media parties are different.

Id. at *4.  Indeed, language in Castro suggests this interpretation is correct in that the decision speaks of "enlightening the public," and that there is no distinction between "*news* for information" and "*news* for entertainment," 370 N.J.Super. at 298 (emphasis added).  Other decisions applying New Jersey law, such as Tellado, contain similar news-related language.  643 F.Supp. at 914 (discussing Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977)).

That said, case law and commentaries discussing New Jersey law make clear that the touchstone of the commercial purpose requirement is whether the publication uses the plaintiff's likeness "for the purpose of capitalizing upon the name by using it in connection with a commercial project ...."  Palmer, 96 N.J.Super. at 79; see Castro, 370 N.J. Super. at 297 ("defendant[s] would be liable for the tort of misappropriation of likeness only . . . if defendant was seeking to capitalize on defendant's likeness) (quoting Tellado, 643 F.Supp. at 909-10); 49 N.J. Prac., Bus. Law Deskbook § 16:4 (2009-2010 ed.) ("In New Jersey, an advantage or benefit accruing to the defendant is a *sine qua non* for a successful claim: mere publicity is not actionable; it must be shown that defendant acted with a commercial purpose or otherwise sought some benefit from revealing information about plaintiffs.) (emphasis in original) (internal quotation marks omitted).  As the Restatement puts it, "[u]ntil the *value* of the name has in some way been appropriated, there is no tort."  Restatement (Second) of Torts, § 652C c (emphasis added).

Thus, in my view, to show that the commercial purpose requirement is met here, Plaintiff would have to allege that Defendant used his likeness to increase its sales of the video games, for example.  Plaintiff proposes to assert that "[w]ith its NCAA Football video game, Defendant . . . allows the public to simulate the college football playing experience by stepping into the shoes of

15

Rutgers' QB Ryan Hart, and other college football players, *where fans can mimic Plaintiff's style and movements and play against Plaintiff's actual opponents.*" Pl. Opp. Br. at 3 (emphasis added). This allegation, though inartfully plead, may evoke the notion that Defendant has utilized Plaintiff's image in order to increase sales of its video game.  Accord Presley's Estate, 513 F.Supp. at 1360 (concluding Elvis impersonator's use of Elvis' likeness in his stage show was primarily to appropriate the commercial value of Elvis' likeness even though the impersonator's show had some independent, creative, entertainment value).

In sum, "[w]hile the Court could ignore [Plaintiff's Declaration] and test the sufficiency of the allegations in the [Amended Complaint] without reference to [the Declaration or briefs]," I find it more efficient and in the interest of justice to "grant Plaintiff leave to amend the Complaint . . . and to permit Defendants to refile their dismissal motions following Plaintiff['s] amendment." Liberty and Prosperity 1776, Inc. v. Corzine, Civil Action No. 08-2642, 2009 WL 537049, *7 (D.N.J. Mar. 3, 2009) ("the court should freely give leave [to amend the complaint] when justice so requires") (quoting Fed.R.Civ.P. 15(a)(2)).  The Court, thus, grants Defendant's motion to dismiss without prejudice, so to afford Plaintiff the opportunity to file a Second Amended Complaint.  In so ruling, the Court is not holding that Plaintiff's proposed allegations are sufficient as a matter of law.  Rather, the Court merely concludes that the sort of allegations Plaintiff's proposes suggest that an amendment may not be futile.

With regard to Defendant's First Amendment defense, applicability of the defense depends upon whether the video game is considered commercial speech or an artistic work.  See Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1018 (3d Cir. 2008) (discussing first amendment defense in trademark context).  Indeed, the Third Circuit noted in Facenda that sports-related

video games may contain both noncommercial and commercial elements.  Id. at 1017.[6]  Accord Scott Jon Shagin, Celebrity Rights in New Jersey, 231 N.J. Lawyer 15, 17 (2004) ("The First Amendment defense analysis becomes especially thorny in circumstances where the use of the celebrity's identity may serve dual purposes:  as expressive speech designed to entertain or newsworthy speech designed to inform, but also as speech that is designed to help sell products or services.")  Typically, this sort of defense is heard on a motion for summary judgment in light of the intricate facts that the Court must consider in divining the nature of the speech.  See e.g., id. at 1011; see In re Orthopedic Bone Screw Products Liability Litigation, 193 F.3d 781, 793-94 (3d Cir. 1999) (explaining a number of key facts that must be assessed in ruling on First Amendment claim involving potentially commercial speech).  For this reason, the Court will not consider Defendant's First Amendment defense at this juncture.[7]  If Plaintiff chooses to file a Second Amended Complaint, the Court will consider the First Amendment defense by way of an appropriate motion brought by Defendant.

---

[6]      Defendant attempts to rely on Facenda for the proposition that a video game is an expressive work entitled to First Amendment protection; however, the speech at issue in Facenda was a thirty-minute video program describing a video game, which the Third Circuit held (on summary judgment) to be in the nature of an infomercial.  Thus, any language suggesting that a video game is, by its nature, an expressive work is dicta.  That said, the Court questions whether Plaintiff will be able withstand the First Amendment defense at a later stage in the proceedings.

[7]      Defendant cites Castro for the proposition that the First Amendment defense may be decided on a motion to dismiss.  Castro, however, did not address the First Amendment defense but held that the plaintiffs did not state a prima facie case for misappropriation because they failed to allege a commercial purpose.  370 N.J.Super. at 298-99.  The Court is aware of Castro's comment that "a member of the general public who is subject to videotaping for a television program cannot reasonably expect that he or she will receive payment from the producer of the show. In fact, a substantial First Amendment issue would be raised if a court were to find a right of compensation in such circumstances."  Id. at 300.  In the context of the entire opinion, however, that phrase does not indicate that the Castro Court ruled on First Amendment grounds.

B.      Remaining Claims

1.      New Jersey Consumer Fraud Act

Defendant is correct that Plaintiff's NJCFA claim must be dismissed because he is not a "consumer" and, therefore, does not have standing to bring that claim.  In response, Plaintiff argues that this Court should follow a line of cases holding that competitors have standing to sue under the NJCFA.  While Plaintiff is correct that some cases have held that competitors have standing under the statute, those cases refer to direct competitors of the defendant, *i.e.*, "competitors in a commercial sense."  General Development Corp. v. Binstein, 743 F.Supp. 1115, 1131 (D.N.J. 1990); see Feiler v. New Jersey Dental Ass'n, 191 N.J.Super. 426, 431 (Ch. Div. 1983) ("A practicing New Jersey dentist has standing to complain that another dentist gains an unfair competitive advantage over him by fraudulent billing practices that enable him to promise and deliver cost savings to patients that are unavailable to patients of an honest practitioner.").

Plaintiff is not a direct, commercial competitor of Defendant; he does not produce and sell video games.  See 800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F.Supp.2d 273, 296 (D.N.J. 2006) ("As a cigar retailer, JR cannot be considered a commercial competitor of GoTo's search engine.").  Moreover, he has not pointed to any cases in which a non-direct competitor was held to have standing, and the Court sees no reason to presume that the New Jersey Supreme Court would extend the NJCFA to such plaintiffs.  Accord IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc., Civil Action No. 07-1076, 2009 WL 5205968, *6 (D.N.J. Dec. 28, 2009) (declining to extend NJCFA to cover complaint brought by phone card distributor against phone card provider); Conte Bros. Auto., Inc. v. Quaker State-Slick 50, 992 F.Supp. 709, 716 (D.N.J. 1998) aff'd on other grounds 165 F.3d 221 (3d Cir. 1998) (noting that "commercial resellers such as plaintiffs do not qualify as 'consumers'" and declining "plaintiffs' invitation to construe the [NJCFA] to permit non-

18

consumers such as plaintiffs to assert claims thereunder."). Therefore, the Court concludes that Plaintiff is not a consumer under the NJCFA and dismisses his NJCFA claim with prejudice.

2.      Unjust Enrichment

Defendant argues that Plaintiff may not proceed under the unjust enrichment theory because he has no direct relationship with Defendant, upon which basis he could assert that he reasonably expected to be compensated for Defendant's use of his likeness. While conceding that he "has no direct relationship with Plaintiff to create a reasonable expectation of benefit," Plaintiff's argues that he may nonetheless recover under an unjust enrichment theory because "had [he] known that [Defendant] intended to use his likeness . . . , he had a right to be compensated for such use [and] a jury could determine that Plaintiff had a right of renumeration [sic]." Pl. Opp. at 23. He, further, argues that his filing of the instant suit "reveals an expectation of renumeration [sic]." Id.

This sort of argument has been explicitly rejected by New Jersey courts. In Fasching v. Kallinger, 211 N.J.Super. 26 (App. Div. 1986), the Appellate Division rejected an unjust enrichment claim by survivors of a murder victim who alleged that the defendant author and publisher of a book about the victim profited from the victim's story without first seeking their permission. The court based its ruling on two facts, that the plaintiffs did not confer any benefit on the defendants and that the plaintiff did not expect any remuneration at the time the victim's story was misappropriated. While the "Plaintiffs contend[ed] that had they known defendants were publishing a book they would have expected remuneration," the Court reasoned that "this fact lacks legal significance in the absence of any benefit conferred by plaintiffs." Id. at 36. Fittingly, this is the case upon which Castro, supra, relies in rejecting an unjust enrichment claim based on misappropriation of one's image. 370 N.J.Super. at 299-300.

19

Here, because Plaintiff alleges in his Amended Complaint that Defendant did not seek his permission before using his likeness or photograph, Plaintiff clearly did not confer any benefit upon Defendant.   Accordingly, for the same reasons expressed in both <u>Castro</u> and <u>Fasching</u>, Plaintiff's unjust enrichment claim fails and is dismissed with prejudice.

       3.     Civil Conspiracy

As to Plaintiff's civil conspiracy claim, Defendant argues that it must be dismissed for failure to allege that two parties agreed to conspire.  Plaintiff's Amended Complaint asserts that Defendant conspired, and actively participated in, "utiliz[ing] [Plaintiff's] image for the sale of products bearing the identity and likeness of Plaintiff in disregard of the rights of Plaintiff."  Am. Compl. at ¶¶ 44-45.  There is no mention in the pleading of a second party with whom the Defendant conspired.  Plaintiff argues in his opposition papers that this claim refers to a conspiracy between Defendant, the NCAA, and the Collegiate Licensing Company ("CLC"), which serves as the NCAA's licensing entity.  In this connection, his proposed allegations aver that NCAA rules govern the use of players' images and that Defendant entered into an agreement with CLC to license NCAA member "teams' trademarks, uniforms, logos, etc., licensing all elements except collegiate athletes' likenesses."  Pl. Opp. at 1-2.

Even if the Court permitted Plaintiff to file a Second Amended Complaint to incorporate his proposed allegations regarding the NCAA and CLC, those allegations make no mention of a conspiratorial agreement between Defendant and those parties to utilize his image in disregard of his rights.  Because an agreement is essential to his cause of action, his proposed allegations could not resurrect his claim.  <u>See</u> <u>Morgan v. Union County Bd. of Chosen Freeholders</u>, 268 N.J.Super. 337, 364 (App. Div. 1993) ("A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, *the principal*

*element of which is an agreement between the parties 'to inflict a wrong* against or injury upon another,' and 'an overt act that results in damage.'").  Plaintiff is correct that an agreement may be proven by circumstantial evidence, see id. at 364-65, but he has failed to allege *any* agreement to inflict a wrong or injury.  His only allegation is that Defendant, the NCAA, and the CLC agreed not to license his likeness.  For this reason, granting Plaintiff leave to amend his conspiracy claim would be futile and his claim is, therefore, dismissed with prejudice.

IV.    CONCLUSION

    For the foregoing reasons, Defendant's motion is granted.  Plaintiff's right of publicity claims are dismissed without prejudice, and Plaintiff is granted leave to file a Second Amended Complaint asserting such a claim within twenty (20) days.  Plaintiff's remaining claims are dismissed with prejudice.


                                               /s/ Freda L. Wolfson
                                              Hon. Freda L. Wolfson, U.S.D.J.

Dated:  September 21, 2010