**\*\* FOR PUBLICATION \*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| | : | |
| RYAN HART, individually and on | : | |
| behalf of all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: 09-cv-5990 (FLW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ELECTRONIC ARTS, INC., a | : | |
| Delaware Corporation; and DOES | : | |
| 1-50, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**WOLFSON, United States District Judge**:

This matter comes before the Court on a motion by Defendant Electronic Arts, Inc. ("Defendant" or "EA") to dismiss Plaintiff Ryan Hart's Second Amended Complaint ("Plaintiff" or "Hart") pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The allegations giving rise to Plaintiff's putative class action lawsuit stem from Defendant's purported misappropriation of the likeness and identity of Plaintiff, a former college football athlete, as well as those similarly situated, for a commercial purpose in connection with four of Defendant's NCAA Football video games. Defendant contends that Plaintiff's claims under New Jersey law for misappropriation of his likeness, which claims the Court treats as a single right of publicity claim, are barred

by the First Amendment.  For the reasons set forth below, the Court treats Plaintiff's

motion as one for summary judgment.  The Court, further agrees that, on balance, on

the facts of this case, Defendant's First Amendment right to free expression outweighs

Plaintiff's right of publicity.  Accordingly, the Court grants Defendant's motion for

summary judgment.

I.    BACKGROUND

       A.    NCAA Football Games

       EA produces a video game series annually called *NCAA Football*.  *NCAA*

*Football* video games permit users to manipulate the actions of over 100 college football

teams and thousands of virtual players in a virtual world with simulated games that

"allows users to experience the excitement and challenge of college football."  Def.'s R.

56.1 Stat. at  1.[1]  The college football teams represented in the game are identifiable

by name, as well as through the use of trademarks such as uniform designs and logos.[2]

Id. at  21.  The virtual players are identified by jersey number and position, although

_____

       [1]      Plaintiff failed to comply with Local Rule 56.1, which requires a response
to Defendant's Statement of Material Facts Not in Dispute to be filed.  Loc. Civ. R.
56.1(a).  Plaintiff included a list of "Material Facts" in his brief in opposition, Opp. at
3-7, but wholly failed to respond to Defendant's purported facts, which is required by
Local Rule 56.1 .  Loc. Civ. R. 56.1(a).  As a result, for the purpose of this summary
judgment motion, the facts submitted by Defendant are admitted and deemed
undisputed.  Malik v. Hannah, --- F.Supp.2d ----, 2011 WL 2580454, *1 (D.N.J. 2011)
(citing Loc. Civ. R. 56.1(a)).

       [2]      Trademarks such as school names, team names, uniforms, logos, and
stadium fight songs appear in the game through licensing agreements between EA and
the NCAA's licensing agent, the Collegiate Licensing Company.  Def.'s R.  56.1
Statement at  21.

a user can edit game data to give the player a surname, which then appears on the player's jersey.  <u>See</u> Supp. Decl. of Strausser, Ex. E; Second Am. Compl. at  59.  Each virtual player's unique attributes, including personal characteristics (height, weight, athletic ability), accessories (helmet visor, wristband), physical abilities (speed and agility, throwing arm, passing accuracy), and biographical details (place of origin) can also be edited by the user.[3]  Def.'s R. 56.1 Statement at  14-15.  Additionally, users with an Internet connection can modify entire teams by downloading custom rosters that have been created and uploaded by video game consumers, including a section of EA's website called Teambuilder.  Second Am. Compl. at  59.  Some rosters available on these websites seek to replicate actual current and former football team rosters.  <u>See</u> <u>id.</u> at  59-61.

These video games are interactive, and users "most directly influence the games' outcome through their own play-calling and their ability to use their hand-held controllers to manipulate the actions of the virtual players."  <u>Id.</u> at  11.  For example, each time during gameplay that a user has the option of throwing a football, the user can control the virtual player's throw distance and accuracy.  <u>Id.</u> at  12.  Users can choose to play a single game against a game-controlled opponent, a second player connected to the same system, or another person connected to the Internet.  <u>Id.</u> at  5.  Multi-game options are also available for users.  <u>Id.</u> at  18.  One of these options is

---

[3]      Certain biographical data may be altered, <u>i.e.</u>, the virtual player's First Name, Last Name, Position, Number, and Hand (right or left-handed).  The virtual player's Home State, Hometown, Team, and Year (freshman, senior, etc.) may not be altered.

"Dynasty" mode, in which the "user controls a college program for up to thirty seasons, creating his own story of the program's development." Id. at 19. Users in "Dynasty" mode are tasked with the "year-round responsibilities of a college coach, such as recruiting virtual high school players out of a random-generated pool of athletes." Id.

      B.     Plaintiff's First Amended Complaint

Plaintiff filed his First Amended Complaint in the Superior Court of New Jersey, Law Division, Somerset County, on October 27, 2009. In that complaint, on behalf of himself and similarly situated athletes, Plaintiff asserted, among other claims, that Defendant had violated his right of publicity based on its use of Plaintiff's likeness as a virtual player on the Rutgers University football team in EA's 2004, 2005, 2006, and 2009 editions of *NCAA Football*.[4]  First Am. Compl. at 22.

On November 24, 2009, EA removed Plaintiff's action to this Court, and then moved to dismiss all counts of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In connection with its motion to dismiss, EA attached copies of the video games for the Court's review since the games were referenced in Hart's initial complaint. In arguing for dismissal of the right of publicity claim, EA contended that Plaintiff's claim failed as a matter of law under both New Jersey state law and the First Amendment. See Docket. No. 8 at 10-23. Moreover, EA argued that Plaintiff had not stated a claim for right of publicity because the First Amended

---

[4]    As New Jersey and federal courts applying New Jersey law interchangeably refer to these claims as appropriation or misappropriation of commercial likeness, and "right of publicity," this Court will do the same.

Complaint did not identify the attributes of Plaintiff that had been incorporated into the *NCAA Football* games.  Id. at 11.

Plaintiff submitted a brief in opposition to EA's motion to dismiss, as well as a Declaration.  Both submissions averred misappropriation of specific attributes of Plaintiff into EA's *NCAA Football* games.  See Court's Sept. 22, 2010 Opinion, Docket No. 23 ("Court's Opinion") at 3-5.  In his Declaration, Plaintiff asserted that the disputed games depicted a "virtual" player that had been designed to replicate Plaintiff's physical attributes, as well as his football skills.  Id. at 3-4.  Further, Plaintiff contended that Defendant had used video footage of him playing in a Rutgers University Football game "in promotion for . . . EA's NCAA game."  Id. at 4.  Plaintiff described Defendant's games as allowing consumers "to simulate the college football playing experience by stepping into the shoes of Rutgers' QB Ryan Hart, and other college football players, where fans can mimic Plaintiff's style and movements and play against Plaintiff's actual opponents."  Id. at 4-5 (citation omitted).

On September 22, 2010, the Court granted Defendant's motion to dismiss the First Amended Complaint with prejudice on all counts with the exception of Plaintiff's right of publicity claim, which it dismissed without prejudice.  Id. at 16, 21.  The Court determined that it could not consider allegations presented by Plaintiff outside of its pleadings on a motion to dismiss, and subsequently determined that because the First Amended Complaint did not contain allegations "as to what aspects of [Plaintiff's] likeness [were] appropriated" by EA, the Court was unable to decide, as a matter of law, whether Plaintiff could state a right of publicity claim under New Jersey law.  Id.

5

at 6-7, 10.   Nonetheless, the Court did undertake an analysis of New Jersey right of publicity law as it related to the facts alleged in Plaintiff's Declaration and opposition brief, and found that the allegations "appear to state a right of publicity claim under New Jersey law." Id. at 10. Thus, the Court granted Plaintiff's request for an opportunity to amend his Complaint for the second time, and informed EA that the Court would consider its First Amendment defense if Plaintiff filed a Second Amended Complaint.  Id. at 10-11.

      C.    Plaintiff's Second Amended Complaint

On October 12, 2010, Plaintiff filed his Second Amended Complaint ("Complaint"), in which he alleges that EA violated his right of publicity under New Jersey law by misappropriating and incorporating his identity and likeness for a commercial purpose in connection with EA's video games.[5]  As discussed herein, Plaintiff incorporated the proposed allegations that the Court addressed in its September 22, 2010 Opinion.  The Complaint states that Hart's likeness is found in *NCAA Football 2004*, *NCAA Football 2005*, *NCAA Football 2006*, and *NCAA Football 2009*, in violation of his right of publicity.  See Second Am. Compl. at 32.  Thereafter, by way of example of the alleged misappropriation of Hart's image, the Complaint

---

[5]    The two-count Complaint asserts "Invasion of Privacy - Misappropriation of Identities and Likenesses" (Count I) and "Electronic Arts' Misappropriation of Plaintiff and Class Members' Identities and Likenesses is for a Commercial / Trade Purpose - (Infringement)."  EA argues, and Plaintiff does not dispute, that Plaintiff's second "count" is a legal conclusion, and that both counts should be treated as a single right of publicity claim because Plaintiff is seeking "redress for an appropriation of the commercial value of [his] identity." Def. Mot. to Dismiss Br. at 16 (quoting J. Thomas McCarthy, RIGHTS OF PUBLICITY AND PRIVACY § 1 :35 (2d ed. 2010)).  The Court agrees.

makes specific factual allegations about the *NCAA Football 2006* game.

With respect to the *NCAA Football 2006* video game, the Complaint alleges that "[t]he attributes of the 'virtual' player . . . are Plaintiff Ryan Hart's physical attributes as referenced in the Rutgers University Football Media Guide." Id. at ¶ 34. In addition, the Complaint alleges, that "in its NCAA Football 2006 video game, Defendant lists the . . . 'virtual' player quarterback as hailing from Florida ...," id. at ¶ 35, "standing six (6) feet and two (2) inches tall," id. at ¶ 36, and "weigh[ing] one hundred ninety-seven (197) pounds (lbs.) ...," id. at ¶ 37. The Complaint further alleges that the virtual player wears "Hart's jersey number . . . thirteen (13)," id. at ¶ 38, a "left wrist band," id. at ¶ 39, and "a helmet visor," id. at ¶ 40. Finally, Hart's "speed and agility rating . . . passing accuracy rating [and] arm strength" all reflect actual footage of Hart during his 2005 college season, according to the Complaint. Id. at ¶¶ 41-43. Based on the language of the Complaint, it appears that Hart intends for the allegations related to *NCAA Football 2006* to be imputed to *NCAA Football 2004* and *NCAA Football 2005*.

Attached to the Complaint are copies of screenshots taken from *NCAA Football* games, and a copy of the 2004 Rutgers University Football Media Guide. See Second Am. Compl., Exh A-E. The media guide lists biographical facts about Hart, such as his hometown and his physical attributes, such as height and weight. See id. at Exh. A. It, further, describes his football statistics, such as his number of attempts, total offense, and passing yards. Id. The screenshots show images of the virtual player that have been allegedly modeled after Hart. However, Plaintiff did not label the

7

screenshots to link each screenshot to a particular game.

Plaintiff's allegation concerning *NCAA Football 2009* is similarly unclear on the face of the Complaint. For one, the Complaint does not allege that the virtual character that purportedly mimics Plaintiff is featured in NCAA Football 2009. Instead, Plaintiff alleges that his "image was used in the promotion for . . . EA's NCAA Football game wherein [Plaintiff] was throwing a pass with actual footage from Rutgers University's Bowl Game against Arizona State University." Id. at  45. Plaintiff does not expressly identify the video game in dispute, nor any details about the promotion, but based on allegations found in his First Amended Complaint and Defendant's responses, this allegation appears to be referencing *NCAA Football 2009*. EA does not dispute that a photo of Plaintiff "throwing a pass appears in a photo montage inside NCAA Football [2009] that can only be seen when a user selects Rutgers as his or her favorite team," Supp. Decl. of Strausser, Ex. E at 16, Ex. I, but EA contends that it has never used an image of Plaintiff in any advertisement. Def.'s R. 56.1 Statement at  24.

Plaintiff avers that these instances of misappropriation of his identity and likeness were "committed with the full intent of increasing the sales and profits for Defendant(s) since [EA's] heightened realism in NCAA Football videogames translates directly into increased sales and revenues for EA." Second Am. Compl. at  48. According to Plaintiff, video game consumers demand that these games "simulate actual college football matches in the most realistic manner possible, including the use of the 'virtual' players that are modeled after real-life NCAA Football players such as

8

[Plaintiff]." Id. Further, in regards to the users' ability to upload and download team rosters with names of real-life players, Plaintiff, while not alleging that EA has itself made this information available, does fault EA for "tak[ing] no courses of action to prevent" users from uploading rosters that use real players' names without authorization. Id. at 59-63. Plaintiff contends that EA's "courses of action and in-action" on this issue have allowed users to "effectively heighten[] the authenticity and realism of a true NCAA football experience." Id. at 64-65.

       D.    <u>Instant Motion</u>

EA filed the instant motion on November 12, 2010, arguing that the First Amendment to the United States Constitution mandates dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Plaintiff has opposed this motion, and both parties have filed declarations, affidavits, and exhibits. For the reasons explained herein, the Court elects to treat EA's motion as one for summary judgment, and finds that summary judgment is appropriate.

II.    STANDARD OF REVIEW

As noted, Defendant has moved for dismissal, or, in the alternative, summary judgment. Defendant opposes consideration under either standard on the basis that discovery is not complete. See Opp. at 8-9. However, Plaintiff fails to identify how discovery would assist the Court in deciding this speech-based tort case.[6] Indeed,

---

       [6]    Plaintiff states that he "intends to show Defendant's sales records and anticipate [sic] that the sales of each year's *NCAA Football* release remain relatively

discovery is irrelevant to a motion to dismiss under Rule 12(b)(6), which is limited to the complaint allegations. And, for summary judgment purposes, it is Plaintiff's obligation to identify why disposition by way of summary judgment requires discovery. Fed.R.Civ.P. 56(d) (permitting a court to defer considering a motion "if a nonmovant shows by affidavit or declaration that, *for specified reasons*, it cannot present facts essential to justify its opposition") (emphasis added).

Moreover, the question of whether the First Amendment limits Plaintiff's right of publicity claim is one of law, and courts answer this type of question by independently reviewing the disputed speech at the summary judgment stage. See Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1016 (3d Cir. 2008) ("[T]he categorization of speech is a question of law that we must resolve through independent review of the program."); see e.g., id. at 1016 (rejecting First Amendment defense to Lanham Act trademark claims on motion for summary judgment); Hoepker v. Kruger, 200 F. Supp. 2d 340, 344, 347-354 (S.D.N.Y. 2002) (under summary judgment standard, examining a challenged work of art and dismissing New York statutory right of privacy claim based on First Amendment defense). In that connection, as indicated supra, EA has provided the Court with copies of the video games for the Court's review. Furthermore, because the Court will further rely on the affidavits and exhibits submitted by the parties, this motion will be treated as one for summary judgment as opposed to a motion to dismiss.

---

steady." Pl. Opp. at 19. This "discovery" would have no bearing on the Court's analysis of EA's First Amendment defense.

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at

11

256-57.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Id. at 206 (quoting Matsushita, 475 U.S. at 586).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

Additionally, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible.  S.E.C. v. Antar, 44 Fed.Appx. 548, 554 (3d Cir. 2002).

III.    ANALYSIS

For the purposes of this motion, Defendant concedes that Plaintiff has stated a prima facie right of publicity claim under New Jersey law.  Mot. at 1.  Despite this concession, in its moving papers, EA expresses disagreement with statements of New Jersey law made in this Court's September 22, 2010 Opinion.  In that opinion, which granted EA's motion to dismiss Plaintiff's complaint for failure to sufficiently plead a right of publicity claim under New Jersey law, the Court interpreted New Jersey's

12

right of publicity law and concluded that Hart's proposed allegations "appear[ed] to state a right of publicity claim under New Jersey law." Court's Opinion at 10.

To the extent that some of EA's comments suggest that the Court's interpretation of New Jersey case law is inconsistent with First Amendment principles, EA misreads the September 22nd Opinion.[7] That opinion focused on the scope of New

---

[7]      For example, in footnote 12 of its moving brief, EA takes issue with this Court's discussion of Castro v. NYT Television, 370 N.J.Super. 282, 296 (App. Div. 2004), which held that a right of publicity claim could not be lodged by patrons at the emergency room of a public hospital who were videotaped and, later, shown on a reality-based television program. As explained in the opinion, EA relied upon the following language from Castro, to argue that NCAA Football was entitled to First Amendment protection: "it is irrelevant whether a videotape is broadcast in connection with a television story about important public events or a subject that provides only entertainment and amusement …." 370 N.J.Super. at 298. Def. Mov. Br. on Mot. to Dismiss at 13.

Castro did not discuss the First Amendment in its analysis of the plaintiffs' claim in that case, however. Rather, Castro held that the plaintiffs in that case failed to "allege that any of the videotape footage taken of them . . . has been used for 'trade purposes'" and, therefore, that the "plaintiffs' complaints [did] not state causes of action for commercial appropriation of their likenesses." 370 N.J.Super. at 298. EA now takes issue with the Court's comment in the September 22nd Opinion that cases interpreting Castro have limited its holding to news-related entities. Court's Opinion at 15 (discussing Liebholz v. Harriri, Civil Action No. 05-5148, 2006 WL 2023186 (D.N.J. Jul. 12, 2006)). Reading that comment out of context, EA argues that Castro, and other cases discussed by this Court in that opinion, do not stand for the proposition that the First Amendment distinguishes between media and non-media defendants. Read in context, it is clear that this Court was not discussing the First Amendment nor opining on whether a ruling that distinguishes between media and non-media defendants would be appropriate. Indeed, the paragraph following the Court's discussion of how Castro's holding has been interpreted explains that the "the touchstone of the commercial purpose requirement is whether the publication uses the plaintiff's likeness "for the purpose of capitalizing upon the name by using it in connection with a commercial project …." Court's Opinion at 15 (emphasis added). For EA to now argue that the Court suggested that "non-media' expressive speech is entitled to less First Amendment protection than 'media' speech," Def. Mov. Br. in Supp. Mot. to Dismiss at 22, is unfounded.

13

Jersey's right of publicity claim as expressed by state and federal New Jersey decisional law at that time. The opinion did <u>not</u> address the scope of federal constitutional principles that might affect a New Jersey court's interpretation of such a claim. Rather, the Court dismissed Hart's complaint and granted him leave to amend. In so doing, the Court provided an overview of New Jersey's right of publicity law in ascertaining whether granting leave to amend would be futile. The Court was careful to explain that, in granting Hart leave to amend, "the Court is not holding that Plaintiff's proposed allegations are sufficient as a matter of law. Rather, the Court merely concludes that the sort of allegations Plaintiff proposes suggest that an amendment may not be futile." <u>Id.</u> at 16. Without a fully articulated amended complaint before it, the Court chose not to define the precise contours of the misappropriation doctrine, including all potential interpretive effects of First

_____

This is not to say that the <u>Castro</u> court's distinction between media and non-media defendants in its trade purposes analysis may reflect the century-old "newsworthiness" exception to misappropriation claims, which was an early attempt by courts to take into account First Amendment concerns as they related to freedom of the press. <u>See</u> <u>generally</u> Amicus Brief of 73 Law Professors in Support of Defendant/Appellee Jireh Publishing, Inc., For Affirmance, <u>ETW Corp. v. Jireh Publishing, Inc.,</u> No. 00-3584 at 6-8 (6th Cir. 2000) <u>available at</u> <u>http://jurist.law.pitt.edu/amicus/etw_v_jireh.pdf</u> (arguing that "The Definition of Commercial Use in Publicity Law Reflects Understandings of the First Amendment from the Early Twentieth Century"). While more recent cases make clear that non-newsworthy works are likewise entitled to First Amendment protection, as discussed herein, the <u>Castro</u> court did not explicitly address First Amendment concerns. Moreover, as EA recognizes, the defendant in that case was a media defendant, thus, the <u>Castro</u> court did not address the applicability of its holding to non-media defendants.

Amendment doctrine.[6]

Indeed, at the time the Court issued its September 22, 2010 Opinion, the New Jersey Supreme Court had not addressed the misappropriation tort and the First Amendment in one case. A decision by the New Jersey Supreme Court rendered after this Court's September 22, 2010 opinion, and after the parties' initial briefing in this case, jointly considers the prima facie misappropriation elements and First Amendment principles.[7]

In G.D. v. Kenny, 205 N.J. 275 (2011), the New Jersey Supreme Court held that the use of a political aide's criminal history in a campaign flyer, created by a public relations and marketing firm at the request of a political opponent, failed to satisfy the commercial purpose element of the misappropriation tort. Id. at 311. In reaching that conclusion, the Court reasoned:

> That the . . . defendants are in the business of public
> relations and marketing and prepared the campaign flyers

---

[6]    This approach of focusing first on whether a prima facie case misappropriation claim is properly pled before ruling on a First Amendment defense to that claim is the approach taken by a recent California district court decision that EA cites to in a supplemental memorandum to this Court. See EA Supp. Memo dated Sept. 6, 2011. That case, Arenas v. Shed Media US, Inc., No. CV 11-05279, Slip Op. (C.D.Cal. Aug. 22, 2011), involved a NBA player's motion for a preliminary injunction against the producers of *Basketball Wives*, a reality television show starring current and former significant others of professional basketball players. The Arenas court first held that the NBA player sufficiently pled a prima facie misappropriation case, under California law, for the use of his identity. Slip Op. at 6. Only after concluding that the prima facie case was properly pled did the court consider the producer's First Amendment defense. Id. at 8.

[7]    EA's reply brief for the instant motion was filed on January 20, 2011, and G.D. was decided on January 31, 2011.

> does not make publication of the flyers a publication in the commercial sense. The campaign flyers represented political speech attacking the judgment of a candidate running for public office. This is the type of speech that is at the heart of First Amendment guarantees. That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment. [Plaintiff] cannot show that the use of his name and image constitutes the tort of misappropriation of one's name and image for a wrongful purpose.

Id. at 311-12 (internal quotation marks and citations omitted). While the G.D. Court did not explicitly define the relationship between the misappropriation tort and the First Amendment, nonetheless, by including First Amendment rationale in its analysis of the plaintiff's prima facie case, the Court construed the tort in a manner to avoid conflict with First Amendment principles.

Because of EA's decision not to challenge the sufficiency of Hart's right of publicity allegations for the purpose of this motion, the Court will focus solely upon EA's assertion of the First Amendment defense—rather than upon how a New Jersey court might construe the prima facie elements of the right of publicity. For this reason, the Court finds EA's inclusion of its disagreement with the Court's interpretation of New Jersey right of publicity law in several footnotes throughout its brief not only irrelevant to the motion but also a distraction from the issue at hand—the scope of EA's First Amendment defense.

Turning now to the First Amendment defense, the parties dispute whether the First Amendment trumps Plaintiff's claim. In EA's opening brief, it argued that the First Amendment bars Plaintiff's right of publicity claim because *NCAA Football* video

games constitute protected expressive works.  Plaintiff disagreed, in its opposition papers, contending that the NCAA Football games constitute speech made for commercial purposes that is not afforded extensive First Amendment protections.

While the motion was under consideration, the United States Supreme Court decided Brown v. Entertainment Merchants Ass'n, 131 S.Ct. 2729 (2011).  That suit involved a First Amendment challenge to a California statute that "prohibits the sale or rental of 'violent video games' to minors, and requires their packaging to be labeled '18." Id. at 2732.  Violation of the statute was punishable by civil fine.  Id.  In light of Brown's potential applicability to the instant motion, the Court directed the parties to file supplemental briefs discussing that decision.

In ruling that the statute was unconstitutional, the Supreme Court confirmed that video games are entitled to First Amendment protection:

> Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection.

Id. at 2733.[8]

---

[8]     Prior to Brown, several appellate and lower court decisions had similarly concluded that video games are entitled to First Amendment protection.  See e.g., E.S.S. Entert. 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1095 (9th Cir. 2008); Interactive Digital Software Ass'n v. St. Louis County, Mo., 329 F.3d 954, 957 (8th Cir. 2003); American Amusement Machine Association v. Kendrick, 244 F.3d 572, 576 (7th Cir. 2001); Dillinger, LLC v. Electronic Arts Inc., --- F.Supp.2d ----, 2011 WL 2446296, *5 (S.D.Ind. Jun. 15, 2011).

Plaintiff argues, in his supplemental briefing, that <u>Brown</u> is of no help to EA here. In Plaintiff's view, <u>Brown</u> is distinguishable because it involved a content-based statute deserving of strict First Amendment scrutiny whereas a New Jersey right of publicity claim, in contrast, is not content-based. EA agrees, in its supplemental briefs, that the statute in <u>Brown</u> was content-based, but further argues that the right of publicity claim asserted here also operates as a content-based restriction because the claim "turns on the particular content of the defendant's work and, in particular, whether the defendant used the plaintiff's name, likeness, or other attribute within the defendant's work." Def. Supp. Br. at 4. EA, further, focuses on <u>Brown</u>'s confirmation that video games are entitled to full First Amendment protection, and construes <u>Brown</u> as suggesting that video games are not commercial speech entitled to less than full First Amendment protection.

A content-based speech restriction is one that regulates "speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." <u>Galena v. Leone</u>, 638 F.3d 186, 199 (3d Cir. 2011). While EA cites to a law review article to support its contention that a New Jersey right of publicity claim operates as a content-based restriction, <u>see</u> Thomas F. Cotter, et al., <u>Integrating the Right of Publicity with First Amendment and Copyright Preemption Analysis</u>, 33 Colum. J. of Law & the Arts 165 (Winter 2011), that article acknowledges that most courts have not adopted the argument it advocates that the "exercise of state publicity

rights is a content-based regulation of speech."[9]  Id. at 169; id. at 167-68 (describing court opinions applying the First Amendment to right of publicity claims as "all over the map" resulting in "confusion reflected in the differing approaches.").  In addition, the article's thesis turns on whether the speech is commercial or non-commercial; in the authors' view, commercial speech implicating the right of publicity must be judged under intermediate scrutiny and noncommercial speech under strict scrutiny.

Contrary to the article's proposal, courts apply one of several tests, referred to in the legal discourse as "balancing tests," that are unique to intellectual property-related cases, to determine whether the First Amendment limits a right of publicity claim in that context.  Courts do not tend to apply strict or intermediate scrutiny tests when addressing a First Amendment defense to intellectual property-related claims, such as the right of publicity. Accordingly, this Court's analysis will focus on the tests actually applied by courts, which tests are explained in more detail infra.

As to EA's latter argument regarding commercial speech, Brown does not explicitly discuss commercial speech.  However, another recent decision of the Supreme Court, Sorrell v. IMS Health Inc., 131 S.Ct. 2653 (2011), does so.  In that case, the Supreme Court made clear that challenges to content-based restrictions on both commercial and noncommercial speech are generally subject to heightened scrutiny.

---

[9]     The authors' "argument that the right of publicity is a form of content-based regulation rests on two premises. The first is that the right of publicity regulates words, sounds and visual images that clearly qualify as 'speech.' The second is that, because the right of publicity cannot be 'justified without reference to the content of the speech,' it is content-based, not content-neutral.  Id. at 190-91 (internal footnotes omitted).

Id. at 2664 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.' . . . Commercial speech is no exception.").

Sorrell was not an intellectual-property related case, however. Moreover, Sorrell did not explicitly overrule Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), which recognized a "commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech," Central Hudson, 447 U.S. at  562, and applied intermediate scrutiny to restrictions on commercial speech.  And, Sorrell acknowledges that "the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.") (citation omitted).  131 S.Ct. at 2672.  Thus, even after Sorrell, commercial speech may still be entitled to less First Amendment protection than that afforded non-commercial speech, in certain contexts.

In any event, whatever First Amendment protection is afforded to commercial speech, *NCAA Football* is not commercial speech.  The Third Circuit's decision in Facenda, supra, explains that courts are to consider three factors in determining whether speech is commercial or noncommercial:

> (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech. An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial.

Id. at 1017 (internal citations and quotation marks omitted).  In conducting this inquiry, courts are to make "a commonsense distinction between speech proposing a commercial transaction ... and other varieties of speech."  Id.

Applying Facenda here, Plaintiff cannot reasonably contend that the *NCAA Football* games constitute commercial speech.  The speech at issue in Facenda was a video that the court characterized as a "late-night, half-hour-long 'infomercial' [for the *Madden Football* video game, that was] only broadcast eight times in a three-day span immediately before the release of the video game to retail stores—much like an advertisement for an upcoming film."  Id. at 1017.  The "infomercial" referred specifically, and solely, to the *Madden Football* video game.  And, the defendant-producer of the game had a financial interest in the sales of the game.  Id. at 1017-18.  In short, the video "aim[ed] to promote another creative work, the video game."  Id. at 1018.  Here, by contrast, the speech *is* the video game that is being sold.  It is not a separate instance of speech that promotes the purchase of another work.

Similarly, in Tellado v. Time-Life, 643 F. Supp. 904, 914 (D.N.J. 1986), a court in this district found that the First Amendment did not insulate the defendant from a right of publicity claim by a Vietnam veteran whose photograph was used in an advertisement for a book series the defendant produced about the Vietnam War.  The Tellado court distinguished between use of the plaintiff's photograph in an advertisement for a book and the hypothetical use of the photograph in the book itself, noting that in the latter case, "defendant's use clearly would have been protected by the First Amendment, regardless of what type of profit defendant expected to make

with its book series." Id.

Further, as courts have long recognized, the First Amendment's guarantee of free speech extends not only to political and ideological speech, but also to "[e]ntertainment . . . motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works." Tacynec v. City of Philadelphia, 687 F.2d 793, 796 (3d Cir. 1982) (First Amendment protects Mummers-type string band performance) (quoting Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65 (1981)) (citations omitted) (live entertainment, including non-obscene nude dancing, is protected by First Amendment); accord United States v. Stevens, 130 S. Ct. 1577, 1585 (2010) (videos showing animal cruelty not categorically unprotected by the First Amendment); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977) ("There is no doubt that entertainment, as well as news, enjoys First Amendment protection."); Kaplan v. California, 413 U.S. 115, 119-120 (l973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection."). The Supreme Court's recent ruling in Brown confirms that video games are entitled to the same treatment. 131 S.Ct. at 2733.

For these reasons, the Court finds no support for Plaintiff's contention that EA's NCAA Football video games are not expressive works entitled to the same protections afforded to other expressive works. Plaintiff's only allegation that appears to make a commercial speech argument is that his "image was used in the promotion for . . . EA's NCAA Football game wherein [Plaintiff] was throwing a pass with actual footage from Rutgers University's Bowl Game against Arizona State University." Second Am.

Compl. at 45. Yet, Plaintiff has produced no evidence that his likeness was ever used in an advertisement for a NCAA Football video game, nor has he suggested that discovery would reveal such evidence. In addition, Defendant denies ever using Plaintiff's image in any advertisement for the games, but has submitted a photograph of Plaintiff "throwing a pass [that] appears in a photo montage inside NCAA Football [2009] that can only be seen when a user selects Rutgers as his or her favorite team." See Def.'s R. 56.1 Statement at 24; Supp. Decl. of Strausser, Ex. E at 16, Ex. I. Because this photograph is part of the video game itself, the commercial transaction has already taken place, and because Plaintiff's photo does not advertise another product or service, the Court finds no basis for concluding that *NCAA Football 2009*—or any other *NCAA Football* video game—is commercial speech.[10]

Having concluded that *NCAA Football* is not commercial speech, the Court now turns to the more thorny question of whether the First Amendment grants EA the right to impinge upon Plaintiff's New Jersey common law right of publicity. The Court begins by discussing the competing interests protected by the right of publicity and the First Amendment, as well as the tests used by courts in balancing those competing interests. Therefore, the Court considers the party's arguments regarding what test the Court should employ to balance Defendant's First Amendment rights against

---

[10]   To be sure, this commercial speech inquiry differs from my analysis of New Jersey's interpretation of the "commercial purpose" element in Castro, supra, and other decisions, in the September 22nd Opinion. As explained above, at the time of that ruling, there was no New Jersey Supreme Court case that considered First Amendment principles in construing the elements of the right of publicity tort.

Plaintiff's right of publicity—the transformative test or the <u>Rogers</u> test.[11]  Finally, the Court performs both balancing tests in light of the parties' arguments, and concludes that, in this case, the First Amendment serves as a defense to Plaintiff's right of publicity claim under either test.

    A.    <u>Competing Interests of the Right of Publicity and the First Amendment</u>

"The area of interrelated torts encompassed by the umbrella term 'invasion of privacy' is largely an American contribution to the common law, which is usually said to have its origins in the seminal law review article by Samuel Warren and Louis Brandeis published in 1890."  Rodney A. Smolla, 3 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 24:2 (2011) ("Smolla").[12]  New Jersey first recognized this common law right in 1907, in a case holding that an individual has the "right to prevent the unauthorized, commercial appropriation of his name or likeness."  See <u>Edison v. Edison Polyform Mfg. Co.</u>, 67 A.2d 392 (Ch. Div. 1907) <u>cited in</u> Brent A. Olson, Esq., et al., <u>The Right of Publicity</u>, 49 N.J. Prac. § 16:3 n.9 (2010-2011 ed.) ("<u>Right of Publicity</u>").  Years later, in a 1960 article, Dean William Prosser proposed four distinct privacy torts, including one for the "appropriation, for the defendant's benefit, of the plaintiff's name or likeness."  <u>Canessa v. J. I. Kislak, Inc.</u>, 97 N.J. Super. 327, 334 (Law Div. 1967)

---

[11]    For reasons explained below, the Court will not engage in an analysis under the "predominance test," an additional test that Hart urges the Court to adopt.

[12]    A New Jersey court notes that "[i]t was first discussed in an essay published in a law journal in 1860 but it never gained prominence until the article written by former U.S. Supreme Court Justice Brandeis, in collaboration with Frank Warren, was published in 4 Harv.L.Rev. 193 (1890)."  <u>Palmer v. Schonhorn Enterprises, Inc.</u>, 96 N.J.Super. 72, 75 (Ch. 1967).

(citing W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 117 (5th ed. 1984).  See William L. Prosser, Privacy, 48 Cal.L.Rev. 383, 389 (1960).

Despite its early characterization as a privacy right, by 1967, New Jersey cases treated the tort as a property right.  See Canessa, 97 N.J. Super. at 352 ("We therefore hold that, insofar as plaintiffs' claim is based on the appropriation of their likeness and name for defendant's commercial benefit, it is an action for invasion of their 'property' rights and not one for 'injury to the person.").[13]  To be sure, the privacy-based appropriation tort, as envisioned by Prosser, encompassed "both personal and commercial interests caused by an unauthorized exploitation of the plaintiff's identity." Restatement (Third) of the Law of Unfair Competition § 46, comment b.

Throughout the tort's development, its underlying purpose has been to protect a person's name, likeness, voice, and biographical data from exploitation by others who

_____

[13]    The distinction between a privacy-based versus a property-based tort is that

> [t]he privacy-based action is designed for individuals who have not placed themselves in the public eye. It shields such people from the embarrassment of having their faces plastered on billboards and cereal boxes without their permission. The interests protected are dignity and peace of mind, and damages are measured in terms of emotional distress. By contrast, a right of publicity action is designed for individuals who have placed themselves in the public eye. It secures for them the exclusive right to exploit the commercial value that attaches to their identities by virtue of their celebrity. The right to publicity protects that value as property, and its infringement is a commercial, rather than a personal tort.

Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc., 867 F.Supp. 175, 188-89  (S.D.N.Y. 1994).

seek economic or other benefit from that use.  See Bisbee v. John C. Conover Agency, Inc., 186 N.J. Super. 335, 343 (App. Div. 1982); Tellado v. Time–Life Books, Inc., 643 F. Supp. 904, 909-10 (D.N.J. 1986).  As explained in this Court's September 22, 2010 Opinion granting EA's motion to dismiss without prejudice,

> Underlying this right is the theory that "a celebrity has the right to capitalize on his persona, and the unauthorized use of that persona for commercial gain violates fundamental notions of fairness and deprives the celebrity of some economic value in his persona." Because celebrity status often translates to economic wealth, the unauthorized use of one's persona "harms the person both by diluting the value of the name and depriving that individual of compensation."

Hart v. Electronic Arts, Inc., 740 F.Supp.2d 658, 664 (D.N.J. 2010) (internal citations omitted).

The term "right of publicity" made its first appearance in a federal court opinion in 1953, in Haelen Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir. 1953).  That case concerned the use of player images on baseball cards, and the opinion described the right of publicity as an economic, as opposed to personal, right. See Marshall Leaffer, The Right of Publicity: A Comparative Perspective, 70 Albany L. Rev. 1357, 1360 (2007) ("Publicity").  The opinion explained: "a man has a right in the publicity value of his photograph . . . [and] to grant the exclusive privilege of publishing his picture ...." Haelen, 202 F.2d at 868.  The court did not characterize this right as a property right because "[w]hether it [was] labelled [sic] a 'property right' [was] immaterial." Id.  What mattered was that "courts enforce a claim which has pecuniary worth." Id.

Following <u>Haelen</u>, states began to recognize a common law right of publicity and some states even enacted statutes protecting such a right.  The right, effectively, became a property right, with some statutes providing that the right might be transferred through will or intestacy.  <u>Publicity</u>, <u>supra</u> at 1360.[14]  The right of publicity is now recognized by a majority of the states in the United States, though the scope of the right and its transferability varies by state.

New Jersey has adopted the Restatement of Torts 2d (1977), thereby incorporating the common law privacy right of appropriation into its state law.  Unlike other states, such as California and New York, New Jersey has not enacted a right of publicity statute.  Nonetheless, given the similarity between the two doctrines, and that New Jersey treats its misappropriation tort as a property-based rather than privacy-based right, the Third Circuit has used the terms appropriation and right of publicity, interchangeably, to refer to the common law right in New Jersey.  See <u>McFarland v. Miller</u>, 14 F.3d 912, 917 (3d Cir. 1994) ("In New Jersey, the right of publicity is a property right.")  Examples of New Jersey right of publicity claims upheld by courts include the misappropriation of professional golfers' names and playing profiles, <u>Palmer v. Schonhorn Enterprises, Inc.</u>, 96 N.J.Super. 72, 232 A.2d 458 (Ch.

---

[14]    In recent years, the appropriation tort has "shifted towards being a property protection similar to the right of publicity."  Daniel J. Solove, et al., INFORMATION PRIVACY LAW at 207 (3d ed. 2009).  See also Jonathan Kahn, <u>Bringing Dignity Back to Light:  Publicity Rights and the Eclipse of the Tort of Appropriation of Identity</u>, 17 Cardoza Arts & Ent. L.J. 213, 213-14 ( 1999) ("[O]ver the years, the privacy-based tort of appropriation has receded into the background as its flashier cousin, publicity, has risen to prominence.  Such is perhaps to be expected in a world where seemingly everything has become a saleable commodity.")

1967), and the use of a photograph of a former Vietnam veteran in a letter advertising a non-fiction book on the Vietnam War, Tellado, 643 F.Supp. at 909–10.

Recently, one federal district court in California assumed, without expressly deciding the issue, that a former collegiate football athlete, like Hart, was entitled to pursue a right of publicity claim for EA's use of his image in *NCAA Football*. See Keller v. Electronics Arts, Inc., No. C 09–1967, 2010 WL 530108 (N.D.Cal. Feb. 6, 2010).[15]  Here, as noted, EA also assumes for the sake of argument that Hart has properly asserted a right of publicity claim.

When an author or creator uses another individual's image in a work, the First Amendment rights of the author or creator are implicated.  There are several theories or policies underlying the First Amendment, including the marketplace of ideas, human dignity and self-fulfillment, and democratic self- governance.  See Smolla, supra at § 2:3; McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY §§ 7:3, 8:16, 8:18 (2d ed. 2008).  Important here is the human dignity and self-fulfillment theory, which views the right of free expression as central to the dignity and self-realization of the

---

[15]     Relatedly, another suit recounts that a jury awarded over $35 million in damages to a group of retired professional football players whose names and likenesses were used in an EA game.  James J.S. Holmes, et al., Defining Liability for Likeness of Athlete Avatars in Video Games, 34 L.A. Lawyer 17, 18 (May 2011).  That suit was not against EA directly, but was against the former players' union for its breach of contract and breach of fiduciary duties.  See Parrish v. Manatt, Phelps & Phillips, LLP, 2010 WL 5141848 at *3 (N.D.Cal. Dec. 13, 2010) (describing the "Adderley" litigation).  While that verdict was on appeal, the case settled for $26.25 million.  Id.  See also ESPN, NFLPA settles Adderley suit, www.espn.com (Jun. 4, 2009) attached as McIlwain Cert., Exh. D.  Underlying this suit was the premise that the former players held a right of publicity that entitled them to share in licensing fees that EA paid to the players' union for the use of the players' names and likenesses.

individual author or creator.  Smolla, supra at § 2:5.

While it is clear that the right of publicity may encroach upon First Amendment rights, there is little clarity as to how to balance the competing interests that each set of rights protects.  As one scholar has noted, "[m]ost would acknowledge that the right of publicity needs to be reigned in when it burdens free expression, but no one convenient legal format has been found to set those limits . . . The fact is that no judicial consensus has been reached on the contours of the First Amendment vis-a-vis the right of publicity."  Publicity, supra at 1363.  Indeed, this body of law can be aptly described as "disordered and incoherent."  Id.

For example, "New Jersey recognizes a robust First Amendment constitutional defense to right of publicity claims: if the speech is newsworthy and informative, it may be protected even if it incidentally implicates the right of publicity; if, on the other hand, the speech is primarily commercial, the privilege may be lost."  Right of Publicity, supra at § 16:3.  New Jersey, further, recognizes First Amendment protection for entertainment-based, news-related works.  As the Third Circuit stated in Jenkins v. Dell Pub. Co., 251 F.2d 447 (3d Cir. 1958), cert. denied, 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958) (en banc), "it is neither feasible nor desirable to make a distinction between *news* for information and *news* for entertainment in determining the extent to which a publication is privileged."  Id. at 451 (emphasis added).

This Court is not constrained by First Amendment analysis employed by New Jersey courts in this context because just as state courts are not limited by federal

court interpretations of the U.S. Constitution, so too is this Court not bound by state court interpretations of the U.S. Constitution.  See Surrick v. Killion, 449 F.3d 520, 535 (3d Cir. 2006); Kermani v. New York State Bd. of Elections, 487 F.Supp.2d 101, 114 (N.D.N.Y. 2006) ("Federal District Courts are not bound to adopt or follow the decisions of State courts when the State courts interpret Federal constitutional principles, even when those principles are applied to state statutes.")[16]  See also Zacchini, 433 U.S. at 567 (describing First Amendment limitation as a "federal" issue).

Moreover, neither New Jersey nor the Third Circuit has explicitly adopted a test that reconciles First Amendment interests with the state right of publicity.  Accordingly, I look to decisional law throughout the country that has attempted such reconciliation, as well as secondary sources, for guidance.  As noted, many decisions and sources refer to the attempt to reconcile the competing interest of publicity rights and First Amendment rights as a type of "balancing test."

Courts throughout the United States have utilized up to eight "balancing" tests that attempt to weigh the First Amendment rights of an author/creator against the right of publicity.  Michael D. Scott, 1 SCOTT ON MULTIMEDIA LAW § 11.49 - § 11.52 (3d ed. 2006).  It is important to note, before describing the various tests, that the Supreme Court in Zacchini, the only Supreme Court case addressing a First Amendment defense

---

[16]     This is not a case involving undecided questions of state law that would require the exercise of Pullman abstention in order to afford New Jersey courts the opportunity to first interpret a state law "in a way that alters or eliminates the federal question."  McMullen v. Maple Shade Tp., 643 F.3d 96, 100 (3d Cir. 2011).  Rather, New Jersey courts have already recognized that the right of publicity is subject to First Amendment limitations.

to the right of publicity, did *not* engage in a balancing of the competing interests.

Zacchini involved a television station's broadcast, in its news programming, of a stunt performer's entire cannonball act without the performer's permission. Ruling in favor of the performer's publicity right, and against the broadcaster's reliance on the First Amendment in defense of its airing of the performance, the Zacchini Court reasoned that the First Amendment "does not immunize the media when they broadcast a performer's entire act without his consent." Id. at 575. And, the Court added, "the rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." Id. at 576.

Since Zacchini was decided in 1977, however, many courts have limited its application to its facts; only when a performer's entire act is appropriated do courts find it unnecessary to engage in any balancing. See ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 956 (6th Cir. 2003) ("Zacchini has been criticized as being very 'narrowly drawn' in that it involved the wholesale reproduction of a live 'entire act ....'"); McCarthy, supra at § 8:27. See also Wisconsin Interscholastic Athletic Ass'n v. Gannett Co., Inc., --- F.3d ----, 2011 WL 3773844, *10 (7th Cir. Aug. 24, 2011) (reasoning that Zacchini "distinguishes between the media's First Amendment right to "report on" and "cover" an event and its lack of rights to broadcast an "entire act.""); id. at *11 (". . . *Zacchini* makes clear [that] the newspapers do not have the underlying

right to broadcast an entire event ....").[17]

The two key tests followed by courts today are the transformative test, which is borrowed from the copyright fair use doctrine, and the Rogers test, which is most often applied in Lanham Act trademark actions.  Here, Hart advocates for the former and EA for the latter.  The United States Supreme Court, the Third Circuit, and the New Jersey Supreme Court have not explicitly endorsed either test.

Hart further urges the Court to adopt a third test he describes as "the predominance test."  This test, Hart argues, was utilized by a district court in this district in Estate of Presley v. Russen, 513 F.Supp. 1339, 1356 (D.N.J. 1981).[18]  That decision, however, predates both the transformative test and the Rogers test.  More importantly, the court in Presley was not fashioning a "test," but applied First Amendment principles to the Elvis impersonation act at issue in that case, and courts have since limited Presley to its unique facts.  See e.g., Romantics v. Activision Publ'g, Inc., 574 F.Supp.2d 758, 766 n.3 (E.D.Mich. 2008) (distinguishing Presley as involving "merely a copy or imitation" of a performance); Bosley v. Wildwett.com, 310 F.Supp.2d 914, 928 (N.D. Ohio 2004) (relying on Presley where images, in that case, were "mere

---

[17]    See also C.B.C. Distrib. and Mktg., Inc. v. Major League Baseball Advanced Media, L.p, 443 F.Supp.2d 1077, 1098 (E.D.Mo. 2006) aff'd 505 F.3d 818 (2007);  Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387, 401 (2001).

[18]    Hart's "predominance test" should not be confused with the test adopted by the Missouri Supreme Court in Doe v. TCI Cablevision, 110 S.W.3d 363 (Mo. 2003), a test that has received some attention in the legal literature but has not been adopted by many courts.  That test is referred to as the "predominant use test."  Id.

copies").

Notably, Presley suggested that the copyright fair use doctrine serves as an appropriate analogy for balancing First Amendment interests with right of publicity concerns.  In this way, Presley predicted a transformative-style test.  Presley, 513 F.Supp. at 1359 ("[While entertainment ... enjoys First Amendment protection . . . , entertainment that is merely a copy or imitation, even if skillfully and accurately carried out, does not really have its own creative component and does not have a significant value as pure entertainment.").  As the Presley court reasoned:

> Unlike a copier, a parodist or satirist adds his own new and creative touches to the original work, which, in this case, would be the likeness of Elvis Presley as he is performing. The original work basically becomes part of a new and different work which derives its popularity from the added creative elements. The original work, or the likeness of Elvis Presley, is being used in a different manner and for a different purpose.

Id. at 1360 n.21.  Accordingly, this Court does not view Presley as espousing an independent test that requires separate analysis, and I will focus my analysis on the transformative test that Presley appears to have foreseen, as well as the Rogers test.[19]

In my view, and as explained in more detail herein, the transformative test is more refined than the Rogers test and better balances the competing interests of the right of publicity and the First Amendment.  The transformative test's incorporation of copyright's fair use doctrine not only reflects the common underlying principles

---

[19]    To be sure, the first California decision to adopt the transformative test, Comedy III, supra, referenced Presley.  Comedy III, 25 Cal. 4th at 402.

shared by the right of publicity and copyright doctrine, but properly takes into account the extent of a defendant's use of a plaintiff's image. In this way, the transformative test captures the intricacies involved in deciphering whether a challenged work is a "new" work entitled to First Amendment protection or merely a blanket attempt to profit from another's property without due compensation. That said, I need not explicitly adopt either test because, for the reasons explained herein, EA's First Amendment defense prevails under both tests.

        B.    <u>Transformative Test</u>

The tension between copyright interests and the First Amendment is apparent. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech ...." Yet the Copyright Act, enacted by Congress under the authority of the U.S. Constitution's Copyright Clause, grants individuals monopoly-like power to preclude others from expressing copyrighted material. It is this "paradox," Smolla, <u>supra</u> at § 21:2, that creates tension between the two legal doctrines. The copyright laws grant a copyright owner the right to suppress another person's freedom of speech, when that person seeks to express copyrighted material.

In 2003, the Supreme Court commented on this apparent tension in <u>Eldred v. Ashcroft</u>, 123 S.Ct. 769 (2003). In that case, the Supreme Court observed that both the First Amendment and the Copyright Clause were adopted close in time, suggesting that "in the Framer's view, copyright's limited monopolies are compatible with free speech principles. Indeed, copyright's purpose is to promote the creation and publication of free expression." <u>Id.</u> at 788. Importantly, the Court concluded

thereafter, "copyright law contains built-in First Amendment accommodations." Id. This is because the Copyright Act protects only expression, not ideas, and thereby "strikes a definitional balance between the First Amendment and copyright law by permitting free communication of facts while still protecting an author's expression." Id. at 788-89 (citation omitted). "Due to this [idea/expression dichotomy]," the Court continued, "every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication." Id.

Additionally, the Court noted, the fair use defense codified in the Copyright Act "allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." Id. at 789. Per that defense, "[t]he fair use of a copyrighted work, including such use by reproduction in copies ..., for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." Id. Notably, the Court held that there is no need to apply a strict scrutiny test to First Amendment defenses to a copyright infringement claim in light of the aforementioned, built-in First Amendment protections. Id. at 788 ("We reject petitioners' plea for imposition of uncommonly strict scrutiny on a copyright scheme that incorporates its own speech-protective purposes and safeguards.").

I briefly turn to a description of the idea/expression dichotomy and the fair use doctrine for context. The idea/expression dichotomy serves as one means of alleviating the tension between copyright protection and First Amendment goals. While scholars debate the precise contours of what constitutes an "idea," see generally Smolla, supra

at § 21:5, copyright law protects the "expression of the idea." <u>Id.</u> This expression represents the "selection and arrangement of ideas, as well as a given specificity in the form of their expression which warrants protection under the law of copyright." <u>Id.</u>; <u>see also</u> Melville Nimmer, et al., N<small>IMMER ON</small> C<small>OPYRIGHT</small> § 13.03[A][1].

The contours of the fair use doctrine are more clear.  As codified at 17 U.S.C. § 107, the fair use doctrine is comprised of a list factors for courts to consider:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

<u>Id.</u>

Transformative use was first coined, as a phrase, by Judge Pierre N. Leval in a 1990 Harvard Law Review article on the copyright doctrine of fair use.  In that article, Judge Leval argued that the fair use doctrine is best effectuated if individuals are permitted to appropriate another's expression as "raw material" that the individual then "transform[s] in the creation of new information, new aesthetics, new insights and understandings ...."  Pierre N. Leval, Commentary, <u>Toward a Fair Use Standard</u>, 103 Harv. L. Rev. 1105, 1111 (1990).  Just four years following Judge Leval's suggestion, the Supreme Court employed the transformative use analysis in <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569 (1994).  Quoting from Judge Leval's article, the Court reasoned that "whether and to what extent [a] new work is 'transformative'" informs the Court's analysis as to the first  factor of the fair use analysis, <u>i.e.</u>, the

36

purpose and character of the use.  Id. at 579.

Post-Campbell, California state court decisions have been credited with shaping the development of the transformative use doctrine in right of publicity cases.   The doctrine was adopted by the California Supreme Court in Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387 (2001), in 2001. In that case, the California Supreme Court held that an artist's sale of lithographed t-shirts of the likenesses of The Three Stooges, which likenesses were reproduced from a charcoal drawing, were undeserving of First Amendment protection because the likenesses were insufficiently transformed.  That court recognized that "creative appropriation of celebrity images can be an important avenue of individual expression . . . [because the celebrities] symbolize individual aspirations, group identities, and cultural values."  Id. at 397. Nonetheless, the California Supreme Court cautioned, First Amendment rights may not trample without bounds the right of publicity.

Viewing the right of publicity as akin to an intellectual property right, designed to protect the "considerable money, time, and energy . . . needed to develop one's prominence in a particular field," id. at 399 (quoting Lugosi v. Universal Pictures, 25 Cal.3d 813 (1979)),[17] the Court concluded that a test incorporating elements of the copyright fair use doctrine most appropriately balanced the competing First

---

[17]     The court continued: "Years of labor may be required before one's skill, reputation, notoriety or virtues are sufficiently developed to permit an economic return through some medium of commercial promotion.  For some the investment may eventually create considerable commercial value in one's identity."  Id. (internal citations omitted).

Amendment and right of publicity interests. Id. at 404. The California Supreme Court adopted the U.S. Supreme Court's language in Campbell that "whether and to what extent the new work is 'transformative" should frame the court's balancing test inquiry. Id. (quoting Campbell, 510 U.S. at 579).

The Comedy III Court reasoned that the transformative test best protects the competing interests of protecting the celebrity while preserving First Amendment rights. The Court explained:

> [w]hen artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist.

Id. at 405 (emphasis added). A transformative work, in contrast:

> is not only especially worthy of First Amendment protection, but is also less likely to interfere with the economic interest protected by the right of publicity [because] distortions of the celebrity figures are not, from the celebrity fan's viewpoint, good substitutes for conventional depictions of the celebrity and therefore do not generally threaten markets for celebrity memorabilia that the right of publicity is designed to protect. Accordingly, First Amendment protection of such works outweighs whatever interest the state may have in enforcing the right of publicity.

Id. Ultimately, the California Supreme court concluded, "the right-of-publicity holder continues to enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity." Id.

In addition, the Comedy III Court provided another (oft-quoted) formulation of the transformative test:

> Another way of stating the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question.

Id. at 406. In using the word "expression," the court meant "something other than the likeness of the celebrity." Id. And, the inquiry is a qualitative rather than quantitative one, "asking whether the literal and imitative or the creative predominate in the work." Id.[18] Because the t-shirt lithograph depictions of The Three Stooges were nothing more than portraits that lacked any creative contribution by the artist, the court concluded that the t-shirts were not transformative expressions. Id.

Since Comedy III, many courts have adopted and applied the transformative test. See e.g., Hilton v. Hallmark Cards, 580 F.3d 874 (9th Cir. 2009); C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Adv. Media, L.P., 505 F.3d 818 (8th Cir. 2007); Reyes v. Wyeth Pharmaceuticals, Inc., 603 F.Supp.2d 289 (D.Puerto Rico. 2009); Romantics v. Activision Publ'g, Inc., 574 F.Supp.2d 758 (E.D.Mich. 2008); Bosley v. Wildwett.com, 310 F.Supp.2d 914 (N.D.Ohio 2004); World Wrestling Fed. Entert. Inc. v. Big Dog Holdings, Inc., 280 F.Supp.2d 413 (W.D.Pa. 2003); Mine O'Mine, Inc. v. Calmese, No. 2:10-cv-00043, 2011 WL 2728390, *8-9 (D.Nev. Jul. 12, 2011).

The transformative test, however, has been subject to some criticism. As

---

[18]    The court further noted that, in close cases, "courts may find useful a subsidiary inquiry . . .: does the marketability and economic value of the challenged work derive primarily from the name of the celebrity depicted?" Id. at 407. However, even if this question is answered in the affirmative, "it does not necessarily follow that the work is without First Amendment protection—it may still be a transformative work." Id.

explained by one scholar, the test lacks clear, objective guidelines and, thus, "can encourage judges to be art critics or base decisions on external factors like the fame of the artist."  David Tan, Political Recoding of the Contemporary Celebrity and the First Amendment, 2 Harv. J. Sports & Ent. L. 1, 25-26 (2011).  Tan further explains:

> In addition, the cryptic judicial comments that literal depictions like Andy Warhol's silkscreens of celebrities may also be transformative if they carry a particular social message lend little guidance to how a court may meaningfully determine what constitutes the criteria for transformative use. As shown by recent California decisions, the test is focused on visual transformation which can be overprotective of art and entertainment that contribute little to the discussion of public issues, but underprotective of political speech which may be contextually transformative (because of its recoding) though not visually transformative.. . . In summary, the usefulness of this test appears confined to visual depictions of the plaintiff, and the extent to which the defendant's use has departed from a realistic rendition of the plaintiff's likeness.

Id. at 26.  Moreover, Tan notes, the copyright fair use doctrine, from which the transformative test was crafted, "has been criticized as one of copyright's 'most nebulous and unpredictable aspects' and should only be 'invoked as a last resort [in publicity claims] after all other solutions have been tried and found wanting."  Id. (quoting McCarthy, supra at § 8:38).

While some may question the vagueness of the fair use doctrine, it nonetheless remains the statutory law for copyright matters and the U.S. Supreme Court found it appropriate in Zacchini to analogize the right of publicity to federal copyright law.  See Zacchini, 433 U.S. at 573.  Moreover, the Supreme Court has described the fair use copyright doctrine as embodying First Amendment principles, thereby dispensing with

the need for a strict scrutiny test.  See Eldred v. Ashcroft, 123 S.Ct. at 788-89.  Still, Tan's point that the transformative test may encourage judges to be art critics has some merit.  It is clear from reviewing some of the decisions applying the transformative test, including those discussed below, that courts must engage in a degree of artistic interpretation in order to determine whether a work contains additional expressive elements.  Even considering that the test may have some indeterminate qualities, I find that the test's rooting in the fair use doctrine and its consideration of the extent to which an image is copied fairly takes into account the competing right of publicity and First Amendment interests.

There are several decisions applying the transformative test that deserve mention here.  In 2003, the California Supreme Court held in Winter v. DC Comics, 30 Cal. 4th 881 (2003), that a comic book's use of two musicians as inspiration for comic book characters was a transformative use.  The comic book series features "Jonah Hex," an "anti-hero" in the context of a five volume miniseries that involved, inter alia, singing cowboys and an emporium patterned after the life of Oscar Wilde.  Id. at 886.  Also included in the series were two worm-like creatures in a volume entitled "Autumns of Our Discontent."  Id.  These worm-like creatures, which are half-worm and half-human, are ultimately killed by Jonah Hex in the final volume of the series.  The creatures were named Johnny and Edgar Autumn, and had long white hair and albino features.

Plaintiffs Johnny and Edgar Winter, two musician brothers with long white hair and albino features, sued the creator of the comic books, asserting that the worm-like

creatures were appropriations of their likenesses.  Rejecting their claim, the California Supreme Court reasoned that it "reviewed the comic books . . . [and] can readily ascertain that they are not just conventional depictions of plaintiffs but contain significant expressive content other than plaintiffs' mere likenesses." Id. at 890.  While acknowledging the similar hair and features, the Court concluded that the plaintiffs were "merely part of the raw materials from which the comic books were synthesized," and in the Court's view, the drawings were "but cartoon characters—half-human and half-worm—in a larger story, which is itself quite expressive." Id.  The Court further reasoned that the plaintiffs' fans would not find the comic books a substitute for the musicians' work.  Id.

Several years later, and drawing upon Winter, the Ninth Circuit in Hilton, supra, applied the transformative test to a Hallmark® greeting card that contained Paris Hilton's image and quoted her famous statement "that's hot."  As described by that court, the card

> contains a picture above a caption that reads, "Paris's First Day as a Waitress."  The picture depicts a cartoon waitress, complete with apron, serving a plate of food to a restaurant patron.  An oversized photograph of Hilton's head is super-imposed on the cartoon waitress's body.  Hilton says to a customer, "Don't touch that, it's hot."  The customer asks, "what's hot?"  Hilton replies, "That's hot."  The inside of the card reads, "Have a smokin' hot birthday."

Hilton, 580 F.3d at 891.

The question before the Ninth Circuit was whether Hallmark was entitled to strike and, thereby dismiss, the plaintiff's right of publicity claim based upon its First

42

Amendment defense; the court applied the transformative test to conclude that Hallmark was not so entitled.[19]  After comparing Paris Hilton to the character on the Hallmark card, the court reasoned that "[d]espite [some] differences . . . the basic setting is the same: we see Paris Hilton born to privilege, working as a waitress."  Id. at 891.  This mimics Paris Hilton's role on the popular television show, Simple Life, where Ms. Hilton worked as a waitress.[20]

Two cases applying the transformative test to video games are particularly instructive.  In Kirby v. Sega of America, Inc., 144 Cal.App. 4th 47 (Cal. App. 2006),

---

[19]    Hilton's procedural posture differs from that present in this case.  In Hilton, the Ninth Circuit ruled on a motion to strike under California's anti-SLAPP statute.  The anti-SLAPP (Strategic Lawsuit Against Public Participation) statute is a law "designed to bar meritless lawsuits filed merely to chill someone from exercising his First Amendment rights on a matter of public interest."  580 F.3d at 880 n.1.  The standard of review on a motion to strike brought under California'a anti-SLAPP statute differs in some way from the summary judgment standard applicable to this case.  See id. at 882 ("Such test is similar to the one courts make on summary judgment, though not identical.").  Therefore, in light of the distinct standard of review at work in Hilton, I rely primarily on Hilton's statement of the law as opposed to its application.

[20]    In addition, Hilton states that the Comedy III Court "envisioned the application of the [First Amendment] defense as a question of fact."  580 F.3d at 890.  Hilton quotes the following language from Comedy III, to support its statement: " Although the distinction between protected and unprotected expression will sometimes be subtle, it is no more so than other distinctions triers of fact are called on to make in First Amendment jurisprudence."  Hilton, 580 F.3d at 890 (emphasis in original) (quoting Comedy III, supra at 409).  To the extent Hilton suggests that applicability of the transformative defense is a jury question, I disagree with that reading of Comedy III.  Read in context, the quote simply clarifies that courts and juries are capable of determining whether or not a particular work of art is sufficiently transformative to be worthy of First Amendment protection, even where the distinction between protected and unprotected expression is a subtle one.  See Comedy III, 25 Cal. 4th at 409).

43

a California court ruled that a video game character fashioned after the plaintiff, a celebrity singer was a transformative use protected by the First Amendment.  The plaintiff-singer was a 90's artist who was known for the phrase "ooh la la."  The video game character was named "Ulala," and shared some similarities with the singer.  Id. at 59.  Like Kirby, the character wore platform shoes, had similar facial features and hair color, and wore attire like that worn by Kirby.  Id. at 55.  The character also used phrases known to be used by Kirby, such as "groove," "meow," and "dee-lish."  Id.

However, the *Ulala* character differed from Kirby in physique, and was based, in part, on the Japanese-style animation form of anime.  While the character's hairstyle and primary costume mimics one of Kirby's hair colors and outfits, Kirby often varied her hair color and clothing, the court reasoned.  Importantly, the court noted, the setting for the game was unique— in the game, the character was a space-age reporter in the 25th Century.  Id. at 59. And, the character's dance movements were unlike Kirby's.  Altogether, the court concluded, the video game character was transformative.  Id.

Recently, another California court applied the transformative test to the *Band Hero* video game that included computer-generated avatars designed to look like the members of the rock band *No Doubt*.  In that case, No Doubt v. Activision, Inc., 192 Cal.App.4th 1018 (Cal. App. 2011), the avatars were literal recreations of the band members, who had posed for photography to enable the video game developer to reproduce the band members' likenesses with great detail.  The *No Doubt* band members sued the developer for exceeding the bounds of the parties' license agreement,

44

and relied on their right of publicity as one basis for their suit.  The developer of the video game asserted the First Amendment as a defense.

Ruling in favor of the band members, the court reasoned that the video game was not transformative.  The court reasoned:

> [The developer] intentionally used . . . literal reproductions so that players could choose to "be" the No Doubt rock stars. The game does not permit players to alter the No Doubt avatars in any respect; they remain at all times immutable images of the real celebrity musicians ....

Id. at 1033.  The court contrasted these depictions to those in Kirby, noting that the depictions here were not "fanciful, creative characters."  Id.[21]

Here, NCAA Football's use of Hart's image presents a closer call than that in Kirby and No Doubt.  The Ulala character was placed in an entirely different setting in the video game, although her characteristics relied heavily on the singer.  Hart's NCAA Football virtual player, on the other hand, plays college football—just like Hart did.[21]  In contrast to the transformative Ulala character, the avatars in No Doubt were

---

[21]    One of the justices in No Doubt filed a concurring opinion, disagreeing with the majority that it was necessary to decide the First Amendment question.  Id. at 416.  However, the justice made clear that she "[did] not dispute the majority's reasoning on that issue."  Id.

[21]    For this reason, I do not find EA's citation to the Arenas case helpful.  As noted, Arenas involved an NBA player's challenge to the potential use of his name and likeness on the Basketball Wives reality television program.  On a motion for preliminary injunction, the Arenas court concluded that the television program's potential use of the player's name was transformative because

> it appears that any references in [Basketball Wives] will be incidental to the show's plot as a whole.  At its core, the show is about the women who have or have had

exact replicas of the *No Doubt* band members who could not be altered in any way by the video game user.  Hart's image in *NCAA Football* differs from the images in <u>No Doubt</u> because his image can be altered in many ways—from his personal characteristics (height, weight, athletic ability), to his accessories (helmet visor, wristband).  In addition, the image's physical abilities (speed and agility, throwing arm, passing accuracy), attributes, and certain biographical details (right handed/left handed) can also be edited by the user.

On the other hand, that Hart's image is placed in a college football game is problematic for EA's assertion of a transformative defense.  Placing present and former college athletes, including Hart, into the fittingly-titled *NCAA Football* game setting strongly suggests that the goal of the game is to capitalize upon the fame of those players.  Indeed, "[i]t seems ludicrous to question whether video game consumers enjoy and, as a result, purchase more EA-produced video games as a result of the heightened realism associated with actual players."  Holmes, <u>supra</u> at 20.  This, alone, however, does not mean that EA's use of Hart's image was not transformative.  <u>See Winter</u>, <u>supra</u> at 889 ("[i]f it is determined that a work is worthy of First Amendment protection because added creative elements significantly transform the celebrity depiction, then independent inquiry into whether or not that work is cutting into the

_____

relationships with basketball players rather than the players themselves.  Thus, the show appears to be transformative.

Slip Op. at 9.  *NCAA Football*, in contrast, is about college football players like Hart.

market for the celebrity's images . . . appears to be irrelevant.") (citation omitted). Nevertheless, a game developer that bases its work on real players, in the context of the games that bring them notoriety, may walk a fine line between using reality as a building block for the developer's own creative work and exploiting the hard-earned reputations of college players for its own profit.

For this reason, the Court appreciates the plight of college players who are prohibited by NCAA bylaws from entering into licensing agreements and other "commercial opportunities" during their playing years. Hart Decl., ¶ 5. In this connection, Hart argues that EA has a practice of paying professional football players for the use of their images in EA's professional football video games, suggesting that it is disingenuous for EA to refuse to pay college athletes for the use of their images. In support of this proposition, he attaches the Declaration of Katrina Yu, a law student who avers that she attended a seminar in which Ondraus Jenkins and Michael Shaffer, EA employees, stated that EA licensed professional player images from the players and the NFL. Yu Decl., ¶¶ 1-7. However, the Court may not consider this hearsay evidence for the truth of the matter asserted on summary judgment. See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). That said, EA states that it "does not dispute that it licenses publicity rights from certain NFL players for its *Madden NFL* game ...." Def. Resp. Pl. Stat. Mat. Facts ¶¶ 2, 5.

Hart further states, in a declaration, that EA has a practice of entering into license agreements with Collegiate Licensing Company, "the nation's leading collegiate trademark licensing and marketing company," The Collegiate Licensing Company,

47

About CLC, http://www.clc.com/clcweb/publishing.nsf/Content/aboutclc.html (Sept. 2, 2011), for use of team trademarks, uniforms, and logos, that are included in the *NCAA Football* video game.  Hart Decl. at ¶ 9.  As noted, EA admits that it has licensing agreements with the Collegiate Licensing Company.  Def. Resp. Pl. Stat. Mat. Facts ¶ 15.

That EA may license professional player images, as well as team intellectual property from the N.C.A.A., yet refuse to license former college athlete images may suggest an element of unfairness.  Nevertheless, it bears not on the question before this Court here—whether or not EA's use of Hart's image is protected by the First Amendment.

Viewed as a whole, there are sufficient elements of EA's own expression found in the game that justify the conclusion that its use of Hart's image is transformative and, therefore, entitled to First Amendment protection.  For one, the game includes several creative elements apart from Hart's image.  Similar to the *Madden NFL* video game , as described in a case dismissing a former professional football player's Lanham Act claim, Brown v. Electronic Arts, supra, the *NCAA Football* game contains "virtual stadiums, athletes, coaches, fans, sound effects, music, and commentary, all of which are created or compiled by the games' designers."  Slip Op. at 7.  Furthermore, as explained by Jeremy Strauser, an Executive Producer at EA responsible for the development of *NCAA Football*,

> [t]he virtual world of *NCAA Football* is constructed from a vast array of graphics, sound and other material.  Once a user chooses two college teams to compete against another,

> the video game assigns a stadium for the match-up and
> populates it with players, coaches, referees, mascots,
> cheerleaders and fans — all designed and rendered by EA's
> artists.   Each game has over 100 virtual teams and
> thousands of virtual players.

Strauser Decl., ¶ 4.  The Court's own review of the video games confirms Mr. Stauser's

description.

Even focusing on Hart's virtual image alone, it is clear that the game is

transformative.  It is true that the virtual player bears resemblance to Hart and was

designed with Hart's physical attributes, sports statistics, and biographical

information in mind.  However, as noted, the game permits users to alter Hart's virtual

player, control the player's throw distance and accuracy, change the team of which the

player is a part by downloading varying team names and rosters, or engage in

"Dynasty" mode, in which the user incorporates players from historical teams into the

gameplay.  See id. at ¶¶ 6-8.  That the user is able to change the image's features,

statistics, and teammates distinguishes *NCAA Football* from the game at issue in No

Doubt, where the characters were immutable.[22]  These aspects also distinguish the

---

[22]      Moreover, one court persuasively reasons that the use of player names,
statistics, and biographical data is entitled to First Amendment protection because
that data is in the public domain.  C.B.C., 505 F.3d at 823.  The same reasoning
applies to the public facts connected to Hart's image.  While those public facts are
relevant to Hart's prima facie case that his right of publicity was impinged, a legal
conclusion assumed for the sake of argument here, "it would be strange law that a
person would not have a first amendment right to use information that is available to
everyone."  Id.  The C.B.C. court's rationale is consistent with the copyright
idea/expression dichotomy that the Supreme Court views as properly balancing First
Amendment freedoms with intellectual-property like interests.  See Eldred, 123 S.Ct.
at 789 (noting that, by virtue of the idea/expression dichotomy, "every idea, theory, and
fact in a copyrighted work becomes instantly available for public exploitation at the

video game from the greeting card in <u>Hilton</u>, where Paris Hilton's photograph was used in a single, static setting.

To be clear, it is not the user's alteration of Hart's image that is critical. What matters for my analysis of EA's First Amendment right is that EA created the mechanism by which the virtual player may be altered, as well as the multiple permutations available for each virtual player image. Since the game permits the user to alter the virtual player's physical characteristics, including the player's height, weight, hairstyle, face shape, body size, muscle size, and complexion, <u>see</u> <u>e.g.</u>, Strauser Decl., Exh. F at 4 (Part I) (displaying "Edit Player - Appearance" screenshot), it follows that EA's artists created a host of physical characteristic options from which the user may choose. For example, EA artists created the several different hairstyles that can be morphed onto the image. <u>See</u> <u>id.</u> The Court's review of the game revealed eight such hairstyle options: fade 1, fade 2, close crop, buzzout 1, buzzout 2, afro, balding 1, and balding 2.[23] In my view, the creation of these varied potential formulations of each virtual player alone makes the game a transformative use of Hart's image.

One could argue that the use of Hart's unaltered image as the starting point for the virtual player suggests that EA's use of Hart's image is not transformative. The

moment of publication").

[23]    Similarly, there are 24 "face" options from which a user may choose to alter the appearance of the virtual player's face, as well as 16 "face shape" options. EA artists, further, created the options for all types of equipment, the virtual player's sports ratings, and the player's "player info." The only data that may not be altered is the virtual player's home state, hometown, team, and year (e.g., senior, freshman).

problem with this argument is that it fails to fully take into account the distinctive

interactive nature of video games.  As noted by the United States Supreme Court in

Brown v. Entert. Merch., supra,

> [l]ike the protected books, plays, and movies that preceded
> them, video games communicate ideas—and even social
> messages—through many familiar literary devices (such as
> characters, dialogue, plot, and music) and through features
> distinctive to the medium (such as the player's interaction
> with the virtual world).  That suffices to confer First
> Amendment protection.

131 S.Ct. at 2733 (emphasis added).  This language from Brown recognizes that a

user's interaction with a video game is one of the means by which video games

communicate ideas and social messages.  To deny *NCAA Football* First Amendment

protection because the game initially displays the virtual player in an unaltered form

would not give due accord to this expressive aspect of video games.

That *NCAA Football 2009* includes a photograph of Hart throwing a pass, in a

photo montage that can be seen when a user selects Rutgers as his or her favorite

team, does not alter my conclusion.  Having viewed the montage, it is clear that the

photograph is but a fleeting component part of the montage and the video game as  a

whole.  Because the photograph comprises such a small portion of the entire work, it

cannot be said that the work itself fails to incorporate transformative elements.

This leaves only the screenshot images from the game that Hart attached to his

Second Amended Complaint and his opposition to the instant motion.  As noted, those

images are taken from *NCAA Football*, though Hart has not explained in his papers

from which game or game(s) the screenshots were taken.  In his Complaint exhibit,

51

Hart juxtaposed, next to the screenshots, photographs of himself taken during his college career.  In comparing the screenshots to the photographs, it is clear that the screenshots reflect his image.  Hart further argues that the screenshots show the virtual player "in the same position" as in the photographs. McKenna Cert., ¶ 7.

While the screenshots reflect Hart's image, in my view, the screenshots do not depict the virtual player in the exact position as Hart appears in the photographs. There are variations.  Even if the screenshots did replicate the photographs, that would not end the inquiry—the question here is whether EA's use of Hart's image in the game is transformative. That a few still screenshots in the context of a larger video game reflect his image does not undercut the existence of the additional creative elements of the game, discussed above, and the variable permutations of his image, created by EA's artists, for use in the game.

In this connection, Hart points to a statement from EA's website indicating that the goal of *NCAA Football* (no pun intended) is to create "the most realistic authentic [football] performance [so that the user may] feel what it's like to cover the field and play at the most elite level in college football."  McKenna Cert., Exh. I.  He, further, attaches statements from online articles that also describe the video game as a realistic experience.  See id. at Exh. H, J, K.   Whether EA has attempted to create a realistic experience, however, is not the focus of my inquiry. The pertinent question is whether EA's use of Hart's image is transformative and, for the reasons expressed above, I

conclude that the use is transformative.[24]

My analysis is in contrast to that in Keller, supra, cited by Plaintiff.  In that case, the District Court for the Northern District of California held that *NCAA Football* is not sufficiently transformative.  Looking solely at the image of the former college player-plaintiff in that case, who had previously played for Arizona State University, the court reasoned:

> the quarterback for Arizona State University shares many of Plaintiff's characteristics.  For example, the virtual players wears the same jersey number, is the same height and weight and hails from the same state.  EA's depiction of Plaintiff is far from the transmogrification of the Winter brothers.  EA does not depict Plaintiff in a different form; he is represented as he [sic] what he was: the starting quarterback for Arizona State University.  Further, unlike in *Kirby*, the game's setting is identical to where the public found Plaintiff during his collegiate career, on the football field.

2010 WL 530108 at *5.[25]  EA argued to the Keller court that the court should consider the video game as a whole, and not focus solely on the former player's image.  The court rejected this argument, reasoning that Winter and Kirby did just that.  Id.

As an initial matter, EA's motion before the Keller court was a motion to

---

[24]     Lastly, Hart states in his declaration that, "[i]n addition to my image being used in the video game, my image was used in the promotion for Defendant EA's NCAA game wherein I was throwing a pass with actual video footage from Rutgers' bowl game against Arizona State." Hart Decl., ¶ 20.  However, Hart does not point to any evidence in support of this assertion, he does not explain where or when his image was purportedly used, nor does he attach a copy of this use.  Accordingly, the Court does not consider this ostensible promotional use of his image.

[25]     This aspect of Keller's ruling is currently on appeal to the Ninth Circuit.

dismiss.  As such, the court considered only "those documents whose contents [were] alleged in [the] complaint," 2010 WL 530108 at *5 n.2, and it did not take into account declarations, submitted by EA, that described the games.  Nor did the court consider other materials submitted by the parties, although it did take "judicial notice" of the content of the games.  <u>Id.</u>  That this Court considers EA's motion as one for summary judgment, taking into account declarations and other materials, as well as the games themselves, distinguishes my ruling from <u>Keller</u>.

With regard to <u>Keller</u>'s substantive analysis, that court fails to address that the virtual image may be altered and that the EA artists created the various formulations of each player.  As noted, I find this aspect of the game significant because it suggests that the goal of the game is not for the user to "be" the player, as in <u>No Doubt</u>, where the virtual player could not be altered.  The malleability of the player's image in *NCAA Football* suggests, instead, that the image serves as an art-imitating-life starting point for the game playing experience.  In this way, while the player image may not be fanciful, like the worm-like characters in <u>Winter</u>, it is one of the "raw materials' from which an original work is synthesized, [and] the depiction or imitation of the celebrity is [not] the very sum and substance of the work in question."  <u>Comedy III</u>, <u>supra</u> at 406.  Moreover, one could argue that even the technology that permits users to alter a player's image is itself a noteworthy, expressive attribute of the game.  None of these facts were considered by the <u>Keller</u> court.

Finally, I disagree with <u>Keller</u>'s approach of focusing solely on the challenged image, as opposed to the work as a whole.  Contrary to <u>Keller</u>'s reasoning, I read

Kirby as looking at the video game in that case, as a whole. By focusing on the setting in which the *Ulala* character appeared, Kirby considered the entire game. Similarly, the Winter court considered that the purported images of the Winter brother musicians were "cartoon characters—half-human and half-worm—*in a larger story, which is itself quite expressive.*" Id. at 890 (emphasis added). While the Winter Court did focus most of its attention on the fanciful worm-like characters, it also considered the larger story of which the characters were a part. Moreover, in my view, it is logically inconsistent to consider the setting in which the character sits, which Keller does in its analysis, yet ignore the remainder of the game.

For the aforesaid reasons, I conclude that, under the transformative test, EA is entitled to assert the First Amendment as a defense to Hart's appropriation claim.

C.     Rogers Test

The Rogers test was developed by the Second Circuit in Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989). Courts have determined that application of the Rogers test makes sense "in the context of commercial speech when the appropriation of a celebrity likeness creates a false and misleading impression that the celebrity is endorsing a product." ETW, 332 F.3d at 956 (quoting Comedy III, 25 Cal.4th at 133). Like the transformative test, it is created to balance the competing interests of intellectual property rights and First Amendment freedom-of-expression rights. In contrast to the transformative test, it was developed in the context of trademark law rather than copyright.

In Rogers, the Second Circuit was faced with a Lanham Act, 15 U.S.C. § 1125(a),

55

false-endorsement claim by Ginger Rogers, of the famous film duo of Fred Astaire and Ginger Rogers, against the creators of a film titled "Ginger and Fred." 875 F.2d at 996. This section of the Lanham Act, 15 U.S.C. § 1125(a), creates civil liability for "[a]ny person who shall affix, apply, annex, or use in connection with any goods or services . . . a false designation of origin, or any false description or representation . . . and shall cause such goods or services to enter into commerce ...."

The <u>Rogers</u> court fashioned a "relevance" test, which mandates that Lanham Act liability should not be imposed unless the title to the challenged work has no relevance to the underlying work, or, if the title bears some relevance, whether the title misleads the public as to the content or source of the work.  875 F.2d at 999.  In the <u>Rogers</u> court's view, this test is useful because "[a] misleading title with no artistic relevance cannot be sufficiently justified by a free expression interest."  <u>Id.</u>  This is because

> if a film-maker placed the title "Ginger and Fred" on a film to which it had no artistic relevance at all, the arguably misleading suggestions as to source or content implicitly conveyed by the title could be found to violate the Lanham Act as to such a film.

<u>Id.</u>  If there is some modicum of relevance, the court further reasoned, a title that was "explicitly misleading" could still be found to violate the Lanham Act.[26]  Applying its

---

[26]     By way of example, the court applied its relevance test to the song title "Bette Davis Eyes," and concluded that such a use of Bette Davis' name would be protected by the First Amendment despite the "slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people ...."  <u>Id.</u> at 999-1000.  That slight risk, in the court's view, was "outweighed by the danger of restricting artistic expression ...."  <u>Id.</u> at 999.  In contrast, the court reasoned, the title "The True Life Story of Ginger and Fred" would be an "explicitly misleading description of content."  <u>Id.</u>

newly minted test, the Second Circuit held that "Ginger and Fred" was entitled to First Amendment protection because the film bore some relevance to the film's story and because the title contained no explicit indication that Ginger Rogers endorsed or had a role in developing the film.  Id. at 1001.

Noticeably, the Rogers court does not explain the genesis of its Lanham Act, "relevance test."  See id.  It appears, however, that this test may have been borrowed from a doctrine developed under New York state law that is referred to as the "real relationship" test.  That test was first applied in a 1957 decision by a New York appellate court in Dallesandro v. Henry Holt & Co., 166 N.Y.S.2d 805 (N.Y.A.D. 1957). In that decision, the court applied the "real relationship" test to a right of publicity claim, brought under the New York statute, by a priest who alleged that a book based on his life, and that featured him on the book cover, violated his right of publicity.  The court ruled that the book and cover did not violate the New York statute because the statute does not bar uses connected to matters of public interest.  Id. at 807.

The Dallesandro court described the "real relationship" test as a newsworthiness exception to the statutory right of publicity:

> A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute unless it has no real relationship to the article, or unless the article is an advertisement in disguise. It makes no difference whether the article appears in a newspaper; a magazine; a newsreel; on television; in a motion picture; or in a book. The test of permissible use is not the currency of the publication in which the picture appears but whether it is illustrative of a matter of legitimate public interest.

Id. at 806-07 (internal citations omitted) (emphasis added).  The purpose of the test is to exclude from the New York right of publicity statute those uses of a individual's image that are not commercial in nature or "used for the purpose of trade."  Id.[27]  This test has been criticized because the result reached may be manipulated depending on what level of generality is employed by a reviewing court.[28]

Like the Rogers test, the "real relationship" test does not apply to a use that "has no real relationship to the article, or unless the article is an advertisement in disguise."  Id.  Yet Rogers expands upon the "real relationship" test by not requiring that the

---

[27]     The real relationship test continues to be applied by courts interpreting the new York statute's "used for the purpose of trade" element.   See Messenger v. Gruner Jahr Printing and Pub., 208 F.3d 122, 126-27 (2d Cir. 2000) ("[W]here a plaintiff's picture is used to illustrate an article on a matter of public interest, there can be no liability under sections 50 and 51 unless the picture has no real relationship to the article or the article is an advertisement in disguise ...."); Finger v. Omni Publications Intern., Ltd., 77 N.Y.2d 138, 144-45 (1990) ("[Q]uestions of 'newsworthiness' are better left to reasonable editorial judgment and discretion; judicial intervention should occur only in those instances where there is " 'no real relationship' " between a photograph and an article or where the article is an " 'advertisement in disguise'.") (internal citation omitted).  In addition, the test has been applied by a federal court interpreting District of Columbia law as well.  See Lane v. Random House, Inc., 985 F.Supp. 141, 146 (D.D.C. 1995) ("A plaintiff cannot recover for misappropriation based upon the use of his identity or likeness in a newsworthy publication unless the use has "no real relationship" to the subject matter of the publication.").

[28]     For example, in Finger, the New York Court of Appeals held that a photograph of a large family, with multiple children, used in a magazine article about caffeine and in vitro fertilization, did not violate the family's right of publicity.  77 N.Y.2d at 144-45 .  The family-plaintiffs argued that the article was not related to their photograph because none of the children were conceived by in vitro fertilization.  Rejecting the family's focus on the precise topic explored in the article, the court reasoned that the photograph was related to the article's more general topic of fertility because the picture included several children.  See Solove, supra at 221 (questioning Finger's rationale).

substance of the challenged work be related to newsworthy matters of public interest. Important here is that, while Rogers was addressing a First Amendment defense to a Lanham Act claim, it apparently imported the New York "real relationship"test without explaining why that test was helpful in the Lanham Act context.

In addition to its Lanham Act analysis, Rogers engages in a separate legal analysis of Ms. Rogers common-law right of publicity claim.  In addressing that claim, the Second Circuit noted that "the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement [and is, therefore,] potentially more expansive than the Lanham Act." Id. at 1004.  After clarifying a choice-of-law question as to which state law applied to her claim, the court determined that an Oregon court would determine that Ms. Roger's right of publicity claim failed.  Referencing the Oregon state constitution's free speech clause, which Oregon courts have interpreted more broadly than the federal constitution, Rogers then turned to Oregon decisional law, holding that a celebrity's name may be used in a movie title unless the title was "wholly unrelated" to the movie or the title was "simply a disguised commercial advertisement ...." Id. at 1004.  This "wholly unrelated" and "disguised commercial advertisement" language is strikingly similar to the Lanham Act relatedness test, but comes from a distinct body of law.  Ultimately, it is not clear from my reading of Rogers' language whether it disposed of the right of publicity claim on state law, as opposed to federal constitutional grounds, but other courts have read Rogers as resting on federal constitutional grounds.  See e.g., Parks v. LaFace Records, 329 F.3d 437, 460 (6th Cir. 2003) (discussing Rogers).

EA properly acknowledges in its briefing that <u>Rogers</u> actually involves the application of two separate tests—the Lanham Act test, and the right of publicity test. Some courts have described the Lanham Act as the federal equivalent of a state right of publicity, <u>see</u> <u>Kirby</u>, <u>supra</u> at 57 (citing <u>ETW</u>, 332 F.3d at 924), and have applied the Lanham Act test to appropriation claims like that presented here.  The court in <u>ETW</u> is one example.[29]  In that 2003 case, the Sixth Circuit applied the Lanham Act test to conclude that an artist who depicted Tiger Woods in a painting was entitled to a First Amendment defense for his work.  <u>Id.</u> at 937-38.[30]

Other courts have applied the right of publicity claim test to misappropriation claims.  For example, in <u>Parks v. LaFace Records</u>, <u>supra</u>, the Sixth Circuit applied the right of publicity test in denying summary judgment on a claim brought by the civil rights icon Rosa Parks against a rap group that used her name in a song title.  The Sixth Circuit held that genuine issues of material fact existed as to whether the song title was "wholly unrelated" to the song and whether the use of her name was a "disguised commercial advertisement."  <u>Id.</u> at 461.  These courts may have chosen to apply the right of publicity test because right of publicity claims do not embody the

---

[29]     EA points to <u>Arenas</u>, <u>supra</u>, as an example of a court implicitly applying the <u>Rogers</u> Lanham Act test to a misappropriation claim.  The language EA cites in <u>Arenas</u> consists of one paragraph in the "Transformative Use Defense" section of the opinion, which states, in pertinent part, that "there is an obvious connection between Arenas and [*Basketball Wives*]."  Slip Op. at 9.  I do not find the <u>Arenas</u> analysis useful here because <u>Arenas</u> did not explicitly apply the <u>Rogers</u> test and, apparently, viewed its "connection" reasoning as related to the transformative test instead.

[30]     The <u>ETW</u> court also applied the transformative test to reach the same conclusion.  <u>Id.</u>

same likelihood-of-confusion concerns that the <u>Rogers</u> Lanham Act test is designed to protect.  <u>See</u> <u>Parks</u>, 329 F.3d at 460 ("[A] right of publicity claim does differ from a false advertising claim in one crucial respect; a right of publicity claim does not require any evidence that a consumer is likely to be confused.") (citing <u>Herman Miller, Inc. v. Palazzetti Imports</u>, 270 F.3d 298, 319-20 (6th Cir. 2001); <u>Rogers</u>, 875 F.2d at 1004; <u>Cairns v. Franklin Mint Co.</u>, 24 F.Supp.2d 1013, 1030 (C.D.Cal. 1998)).

Similarly, in <u>Romantics</u>, <u>supra</u>, a district court applied the right of publicity test to conclude that the use of a band's distinctive sound in the *Guitar Hero* video game was not unrelated to the game or a disguised advertisement.  574 F.Supp.2d at 766. While this holding is technically dicta, because the <u>Romantics</u> court first determined that the plaintiffs in that case failed to adequately assert a publicity claim under state law, it further illustrates that several courts have applied the right of publicity test as opposed to the Lanham Act test.  In any event, the Lanham Act and right of publicity tests are very similar and EA argues that it is entitled to a First Amendment defense under either test.  <u>See</u> Def. Mov. Br. at 32 (discussing both tests simultaneously).

EA's argument as to why I should apply <u>Rogers</u> here is convoluted, yet easily addressed.  According to EA, because New Jersey follows the Restatement, and the Restatement (Third) mirrors New York's statutory appropriation tort which a New Jersey court has described as "essentially the same" as New Jersey's common law tort, <u>Tellado</u>, 643 F.Supp. at 912, and because the <u>Rogers</u> test appears to track the

61

Restatement (Third) of Unfair Competition, I should adopt that test.[31] Underlying EA's argument is the assumption that I should follow New Jersey law. However, as explained <u>supra</u>, I am bound by federal law interpretation of the constitutional defenses—not state law interpretations thereof.

Moreover, as explained above, courts have noted that right of publicity claims do not embody the same likelihood-of-confusion concerns that the <u>Rogers</u> Lanham Act test is designed to protect. <u>See</u> <u>Parks</u>, 329 F.3d at 460 ("[A] right of publicity claim does differ from a false advertising claim in one crucial respect; a right of publicity claim does not require any evidence that a consumer is likely to be confused.") (citing <u>Herman Miller, Inc. v. Palazzetti Imports</u>, 270 F.3d 298, 319-20 (6th Cir. 2001); <u>Rogers</u>, 875 F.2d at 1004; <u>Cairns v. Franklin Mint Co.</u>, 24 F.Supp.2d 1013, 1030

---

[31]    It is true that the Restatement (Third) of Unfair Competition promotes a new trend of treating right of publicity claims as competition-based claims, as opposed to property-right-based claims. However, even if this Court were bound by New Jersey's approach to a federal constitutional issue, New Jersey has yet to formally adopt this particular Restatement. That said, there is an historic rationale for applying a test that treats right of publicity actions as akin to unfair competition claims. In the early U.S. Supreme Court opinion of <u>International News Service v. Associated Press</u>, 248 U.S. 215 (1918) <u>superceded by</u> <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), the Court analyzed one news service's almost verbatim copying of another news service's newspaper articles as violating unfair competition laws as opposed to copyright or other property-based laws. <u>Id.</u> at 235-36 ("We need spend no time, however, upon the general question of property in news matter at common law, or the application of the copyright act, since it seems to us the case must turn upon the question of unfair competition in business. . . . [T]his does not depend upon any general right of property analogous to the common-law right of the proprietor of an unpublished work to prevent its publication without his consent; nor is it foreclosed by showing that the benefits of the copyright act have been waived. . . . [T]he news of current events may be regarded as common property. What we are concerned with is the business of making it known to the world, in which both parties to the present suit are engaged.").

(C.D.Cal. 1998)).  And, the <u>Rogers</u> right of publicity test mirrors the Lanham Act test. For this reason, I question the wisdom of applying a trademark-based test to right of publicity claims without accounting for this difference.  The <u>Rogers</u> court did not explain the genesis of its Lanham Act test, yet it appears that the test was borrowed from New York's "real relationship" test.  If that is the case,  <u>Rogers</u> fails to explain why it imported that newsworthiness-based test into the Lanham Act context.[32]

Arguably, one benefit of applying either of the <u>Rogers</u> tests (the Lanham Act or right of publicity tests) is that they are both straightforward, and do not require courts to engage in as much artistic interpretation as required by the transformative test. However, like the "real relationship" test, the <u>Rogers</u> tests may be manipulated depending upon the level of generality employed by the parties or the reviewing court.

It is important to note that the Third Circuit has not adopted the <u>Rogers</u> test in the context of either a Lanham Act claim or a right of publicity claim.  In <u>Facenda</u>, the Third Circuit declined to rule on the test's applicability to a Lanham Act claim.  <u>See</u> 542 F.3d at 1018.  In addition to the Sixth Circuit, two other circuits, however, have adopted the test for use in the Lanham Act context.  <u>See</u> <u>Mattel, Inc. v. MCA Records, Inc.</u>, 296 F.3d 894, 902 (9th Cir. 2002); <u>Sugar Busters LLC v. Brennan</u>, 177 F.3d 258,

---

[32]     Others may argue that the <u>Rogers</u> Lanham Act test derives solely from trademark law.  A dissenting justice in <u>ETW</u> explains that the Second Circuit decision issued shortly after <u>Rogers</u>, <u>Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.</u>, 886 F.2d 490 (2d Cir. 1989), clarified that application of the "the Rogers balancing approach" must "take[] into account the ultimate test in trademark law, namely, the likelihood of confusion as to source of the goods in question" by also applying the "eight-factor likelihood of confusion test ...."  <u>ETW</u>, 332 F.3d at 948 (quoting <u>Cliff Notes</u>, 886F.2d at 495).

269 & n. 7 (5th Cir. 1999).  And, in <u>E.S.S. Entert. 2000, Inc. v. Rock Star Videos, Inc.</u>, 547 F.3d 1095 (9th Cir. 2008), the Ninth Circuit applied the <u>Rogers</u> test to a Lanham Act claim relating to the content of a video game that incorporated the use of a night club's name into the game scenery.

Notably, in <u>Brown v. Electronic Arts</u>, No. 2:09-cv-1598 (C.D.Cal. Sept. 23, 2010) (Slip Op.), the Central District of California applied the <u>Rogers</u> test to conclude that the use of a former professional football player's likeness in EA's *Madden NFL* video game was protected by the First Amendment.  In that Lanham Act action, the court concluded that "the mere use of [the plaintiff's] likeness in the game, without more, is insufficient to make the use explicitly misleading." <u>Id.</u> at 8.  A similar holding was reached in another Lanham Act video game case brought against EA, albeit not a sports-related game.[33]  That court had already dismissed the plaintiff's right of publicity claim on other grounds, but noted that "it would have analyzed that claim under <u>Rogers</u> also ....," <u>Dillinger, LLC v. Electronic Arts, Inc.</u>, No. 1:09-cv-1236, 2011 WL 2457678, *4 n.1 (S.D. Ind. Jun. 16, 2011), at the parties' request.

---

[33]     A recent Lanham Act case applies <u>Rogers</u> to EA's *The Godfather* video games.  That case, <u>Dillinger, LLC v. Electronic Arts, Inc.</u>, No. 1:09-cv-1236, 2011 WL 2457678 (S.D.Ind. Jun. 16, 2011), involved the video game's use of the image of John Dillinger, a gun-slinging bandit from the 1930's era who was a flashy womanizer.  Dillinger was also known for his use of the Tommy Gun submachine gun.  <u>Id.</u> at *2.  In *The Godfather* video game, which is fashioned after Francis Ford Coppola's *The Godfather* films, users may choose a Tommy Gun weapon out of seventeen weapon options.  The weapon is identified, in the game, as the "Dillinger Tommy Gun."  <u>Id.</u> at *3.  Ruling in favor of EA, the court reasoned that EA's use of the "Dillinger Tommy Gun" name in its video game is (1) related to the *Godfather* world where flashy gangsters spray their enemies with such guns, and (2) does not explicitly mislead purchasers into believing that Dillinger sponsored or endorsed the game.  <u>Id.</u> at *6.

In short, although the Third Circuit has not adopted the <u>Rogers</u> test to either Lanham Act or right of publicity claims, there is some precedent for applying the <u>Rogers</u> test to misappropriation actions like that presented in this case.  Accordingly, although I am not convinced by EA's arguments as to the applicability of the <u>Rogers</u> test, and, in my view, the transformative test better balances First Amendment and right of publicity interests, I will assume for the sake of argument that the test applies.  Applying the test here, I conclude that, under either the <u>Rogers</u> Lanham Act test or the strikingly similar right of publicity test, *NCAA Football* is entitled to First Amendment protection.

As noted, the <u>Rogers</u> Lanham Act test is a two-prong test that asks: (1) whether the challenged work has relevance to the underlying work; and (2) if the challenged work is relevant, whether the title misleads the public as to the source of content of the work.  <u>Rogers</u>, 875 F.2d at 999.  The use of Hart's image in the video game has great relevance to the game itself, which is set on a college football field and revolves around the playing of virtual football.  In addition, the use of Hart's image in the game cannot reasonably be said to mislead the public as to the content or source of the video game.  Hart has not suggested, in his opposition brief, that the use of his image leads the public to believe that he has endorsed the *NCAA Football* product.  Indeed, in his opposition brief, Hart fails to adequately address the <u>Rogers</u> test altogether.  He merely cites the case in one footnote, and provides no analysis of the <u>Rogers</u> test factors.

Under the <u>Rogers</u> right-of-publicity test, the two queries are: (a) whether the

challenged work is wholly unrelated to the underlying work; or (b) whether the use of the plaintiff's name is a disguised commercial advertisement.  Rogers, 875 F.2d at 1004.  One cannot reasonably argue that Hart's image is wholly unrelated to the game, for the same reasons expressed under my analysis of the Lanham Act test.  Nor is the use of Hart's image a "disguised commercial advertisement."  Id.  Instead, the use of his image is part of an expressive act by EA that might draw upon public familiarity with Hart's college football career but does not explicitly state that he endorses or contributes to the creation of the game.

As explained by the court in Seale v. Gramercy Pictures, 949 F.Supp. 331 (E.D.Pa. 1996), applying Rogers to a Pennsylvania right of publicity claim, "[i]f the name or likeness is used solely to attract attention to a work that is not related to the identified person, the user may be subject to liability for a use of the other's identity in advertising." Id. at 336 (quoting Restatement (Third) Unfair Competition § 47, cmt c.).  On the other hand, the "use of a person's name and likeness to advertise a novel, play, or motion picture concerning that individual is not actionable as an infringement of the right of publicity." Id. (citing Restatement (Third) Unfair Competition § 47, cmt a.)  Here, EA's use of Hart's image is clearly related to the video game and is not simply an advertisement for an unrelated product.[34]  Therefore, I conclude that EA is

---

[34]      Otherwise put, "[c]ourts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story.  Only the use of an individual's identity in advertising infringes on the persona." George M. Armstrong, Jr., The Reification of Celebrity: Persona as Property, 51 La.L.Rev. 443, 467 (1991) (citing Rogers, 695 F.Supp. at 121 (S.D.N.Y.1988), aff'd, 875 F.2d 994 (2d

entitled to First Amendment protection under the <u>Rogers</u> right of publicity test.

IV.     CONCLUSION

In sum, it is my view that the transformative test best encapsulates the type of nuanced analysis required to properly balance the competing right of publicity and First Amendment interest.  Nonetheless, having concluded that EA is entitled to First Amendment protection under either the transformative test or either of the <u>Rogers</u>' tests, the Court need not decide which test should generally apply to misappropriation cases.   On the facts of this case, EA is entitled to assert the First Amendment defense and its motion for summary judgment must, therefore, be granted.


DATED:       September 8, 2011



                                        <u>/s/ Freda Wolfson</u>
                                        United States District Judge

_____

Cir. 1989)) <u>cited in</u> <u>Matthews v. Wozencraft</u>, 15 F.3d 432, 439 (5th Cir. 1994).